COMPAGNIE GENERALE TRANSATLANTIQUE v. RIVERS.

(Circuit Court of Appeals, Second Circuit. January 13, 1914.)

No. 40.

1. STATUTES (§ 281*)—FRENCH LAW—NECESSITY OF PLEADING.

Where the stateroom of a passenger on a French vessel on the high seas was broken into and she was assaulted by a watchman, it was not necessary that she should plead and prove that the French Law authorized a recovery under such facts; the wrongful entry into her stateroom having been rendered easy of accomplishment through the carrier's negligence, the burden being on the carrier to show any peculiarity of the French law relieving it from liability, if it existed.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 380, 381; Dec. Dig. § 281.*]

2. SHIPPING (§ 166*) — INJURIES TO PASSENGERS — CARE REQUIRED — INSTRUCTIONS.

In an action against the owners of a steamship for an assault on a passenger by a watchman, the court having charged that defendant was not an absolute insurer against assaults of such character, and having pointed out the difference between an assault by an employé when carrying out the orders of his master and a wanton one committed by the employé when off duty, a further instruction that defendant was bound to exercise the very highest degree of care to protect its passengers was not error.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 538–552; Dec. Dig. § 166.*]

———————

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. SHIPPING (§ 166*)—INJURIES TO PASSENGERS—ASSAULT BY WATCHMAN—EVIDENCE.

Where a watchman on a steamship entered a female passenger's stateroom in the nighttime and assaulted her, and the entry was rendered easy because of the loss of a key to the door connecting plaintiff's stateroom with the adjoining one, which was vacant, and defendant's failure to change the lock so that it could not be controlled by the lost key if found and retained by an unauthorized person, and also because of the failure of the night watchman on duty to attend to his duties, the evidence was sufficient to sustain a finding of actionable negligence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 538–552; Dec. Dig. § 166.*]

4. SHIPPING (§ 166*) — INJURIES TO PASSENGERS — ASSAULT — CONTRIBUTORY NEGLIGENCE.

Where plaintiff, a female passenger, on entering her stateroom on a steamship inquired for the key connecting her stateroom with the adjoining one, which was vacant, and was informed by the stewardess that no keys were issued to passengers, but that she should bolt the door on her side when occupying the room, and might leave it open when she was away from it, plaintiff, having once bolted the connecting door, was not negligent in failing to see that it was bolted every time she entered the room, so as to preclude her from recovering for the injuries sustained by being assaulted by a watchman, who entered the room in the nighttime through such door after he had unbolted it.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 538–552; Dec. Dig. § 166.*]

5. APPEAL AND ERROR (§ 1039*)—REVIEW—PREJUDICE.

Where, in an action for injuries to a steamship passenger by an assault by a watchman, the complaint charged permanent nervous injuries, defendant was not prejudiced by the admission of evidence of injury to plaintiff's heart, which was not allowed as an independent ground for recovery.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4075–4088; Dec. Dig. § 1039.*]

6. TRIAL (§ 83*)—HYPOTHETICAL QUESTIONS—OBJECTIONS.

An objection that a hypothetical question "does not contain all the facts," without any statement as to the respect in which it is deficient, is unavailable.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 193–210; Dec. Dig. § 83.*]

7. DAMAGES (§ 168*)—PERSONAL INJURIES—EVIDENCE OF MENTAL CONDITION.

In an action for injuries to a steamship passenger by being assaulted in the nighttime by a watchman, evidence as to mental pain suffered by the plaintiff, and that for a long time after the assault she feared to be alone and was distrustful of everything and every one, was admissible, since the plaintiff's description of her condition after the assault necessarily involved a recital of her mental condition.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 480, 482–486; Dec. Dig. § 168.*]

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review a judgment of the District Court, Southern District of New York, entered on a verdict of $12,500 in favor of defendant in error, who was plaintiff below.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Nolan Bros., of New York City (Joseph P. Nolan and John M. Nolan, both of New York City, of counsel), for plaintiff in error.

Davies, Auerbach & Cornell, of New York City (Charles H. Tuttle and Bertram Winthrop, both of New York City, of counsel), for defendant in error.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. Plaintiff, a widow traveling alone, sailed from New York October 6, 1910, on defendant's steamship La Provence, for a tour in Europe. She occupied, with no roommate, one of the so-called "demi-luxe" cabins No. 653 on the promenade deck. The adjoining cabin No. 651 was not occupied during the voyage. Both cabins had doors opening into the corridor and were also connected by a door through the partition. The door opening into the corridor had a lock and bolt on the inside; the partition door had a lock and a bolt on each side. No stateroom keys were issued to passengers or to any one else; the staterooms were divided into groups of contiguous rooms; for each one of these groups one of the stewards had exclusive charge of a pass-key which controlled the locks of all the doors in the group, corridor, and partition. About three weeks before, on a prior voyage the under-steward, who carried the pass-key to the group of which plaintiff's cabin formed one, lost the key. The loss was reported to his superior; the lost key was never returned. A new pass-key exactly like the lost one was issued to the under-steward, but nothing was done to the locks of this group, no rearrangement made of their interior mechanism, so that they remained controllable not only by the new key, but also by the lost one.

The connecting door was covered on plaintiff's side by a hanging curtain. When she first entered the cabin, on coming aboard, she felt of this door behind the curtain and found it was bolted and apparently locked. The testimony warrants the conclusion that it was then locked and bolted. She asked for a key and the stewardess told her that passengers did not have keys; that when out of the stateroom she should leave her door open, and when in she could keep it closed and bolted. This she did.

In the corridor on which her stateroom opened there were electric lights near the ceiling which burned day and night continuously. At night, when all light in the stateroom was extinguished, enough came through the ventilator from these corridor lights for one to see objects in the stateroom. Close to the berth in every passenger stateroom, where they could be easily reached without rising, were two push-buttons; one of them turned on the electric light in the stateroom, the other communicated with a so-called bell-board at the forward end of the corridor, on which plaintiff's stateroom was located. The bell-board was about the width of three staterooms away and served for the group of demi-luxe staterooms. It bore the numbers of each stateroom; when a button was pushed, an electric alarm or "buzzer" sounded, and the number of the stateroom in which the button had been pushed was illuminated. The regulations of the ship called for a man to be stationed continuously day and night immediately opposite the

bell-board, in order to hear and respond promptly to any call. His station was such that he commanded a view of the corridor which has been referred to; if he were conscious and his eyes were open the lights in the corridor could not be turned out at night without his perceiving it. These lights could be turned out by switches at the top of the wall. Among those who, in successive reliefs, were assigned to this post were Lamure, a day watchman, referred to in the testimony as a bell-boy, and Fructus, a night watchman.

The plaintiff suffered from seasickness and passed most of her time in the stateroom. On the afternoon of the last day, however, she was out of it for two or three hours, passing Lamure on her way to the deck. She returned to her stateroom about 6 p. m., ate something, and lay in her berth reading until about 9 p. m., when, wanting some one to come, she pushed the bell-board button. She did this repeatedly from 9 to 11 p. m., but no one came until the last named hour. Then her room steward, Coret, came. Asked if he had not heard the bell, he said he had had to wait in the dining room, had had extra things to do. After he left plaintiff rose and bolted her door, put out the stateroom light, and fell asleep. Shortly thereafter she awoke, thinking she heard some one at the window; she got up, satisfied herself that the shutter was bolted, returned to her berth, and again fell asleep. The testimony of others indicates that when she next awoke it was 2:30 a. m. The first thing she was conscious of was that it was pitch dark (the corridor lights had been turned out); this terrified her, thinking there had been some accident to the machinery. She listened intently for quite a while, hearing the throbbing of the engine, until she heard "a little noise somewhere around the door to No. 651." She at once pressed both buttons. As the stateroom light shone out, the curtains to her berth were pulled apart, and she saw a figure in black standing there. This was Lamure. From the evidence it is manifest that he had found the lost pass-key, had slipped into No. 653 while plaintiff was out of it on the afternoon of the last day, and slipped back the bolt of the connecting door behind the curtain, had made his way in the dead of night up three decks (his sleeping quarters, where he was required to be at that hour, were below) and along the whole length of the ship unobserved. That he had entered No. 651 using the pass-key. Once there he had taken off his uniform, collar, necktie, and false shirt front and put on a bag of black lustrine as a mask, with places cut for eyes and mouth. In his pocket he had a length of rope about the thickness of one's finger. Either before or after this change of costume, he had put out the lights in the corridor. He next unlocked the connecting door with the same pass-key (it was found in the lock the next morning), and went to plaintiff's berth.

As the curtains were drawn apart, he struck the plaintiff. This was the beginning of a desperate struggle; plaintiff says it seemed like a lifetime, but probably lasted about ten minutes. Possibly that estimate is too large, but the occurrences which took place certainly indicate that it lasted some time. Plaintiff struggled up and out of the berth three times, and three times beating her on the head clutching her by the throat, and thrusting his knee against her chest, Lamure hurled

her back across the berth, stooping as he got a chance to get hold of the rope. The physical marks left on her head, face, eyes, throat, etc., clearly supported her narrative of the transaction. At last the night watchman, Fructus, arrived and grappled with Lamure, whom he recognized at once; the mask had come off in the struggle. Lamure got away but was subsequently arrested. Fructus did not arrive earlier because he heard no buzzer; what "waked him up was the plaintiff's screams"; he did not know until then that the corridor lights had been put out; manifestly he was asleep on his post. Had he been awake, when the lights were turned out, before Lamure entered either stateroom, he would have known at once that something was wrong and would have interfered, if not with the initiation of the assault, at least with its continuance.

The first point in controversy is whether the complaint sets out a cause of action on contract or in tort. It is unnecessary to decide which is the correct construction of the pleading, because the trial judge interpreted it most favorably to defendant, treating the action as one sounding in tort, and charging that plaintiff could recover only upon proof of some specific negligence on the part of the defendant.

[1] Defendant next contends that, since La Provence was a French vessel, plaintiff could not recover without pleading and proving that under the law of France there could be recovery against the defendant upon the facts proved. It would seem to be almost an insult to any self-respecting civilized country to assume that under its law a common carrier of sleeping passengers would not be responsible for assaults of this sort by its own employés, even though the assault were a wanton one, when such assault was made easy through negligence of the carrier in taking proper precautions to assure the safety of its passengers. We find sufficient authority for this proposition in Cuba Railway v. Crosby, 222 U. S. 473, 32 Sup. Ct. 132, 56 L. Ed. 274, 38 L. R. A. (N. S.) 40; Barrow S. S. Co. v. Kane, 170 U. S. 100, 18 Sup. Ct. 526, 42 L. Ed. 964; Whitford v. Panama R. R., 23 N. Y. 465. If the law of France is peculiarly tender towards common carriers of passengers, it was for defendant to show it.

[2] It is assigned as error that the court charged the jury that defendant was bound to an obligation "of the very highest degree of care to protect its passengers." This phrase is found in the opinion of the Supreme Court in Penn. R. R. v. Roy, 102 U. S. 451, 26 L. Ed. 141. Standing alone, it might possibly lead a jury to believe that the defendant was to be treated as an insurer of the safety of its passengers. But it did not stand alone. The judge charged expressly, more than once, that defendant was not an absolute insurer against assaults of this sort. He pointed out the difference between an assault by an employé when carrying out the orders of his employer and a wanton one, committed when off duty. In this particular he instructed more favorably to defendant than some of the authorities indicate. The Minnetonka, 146 Fed. 509, 77 C. C. A. 217; N. O. & N. E. R. R. v. Jopes, 142 U. S. 18, 12 Sup. Ct. 109, 35 L. Ed. 919; Clancy v. Barker, 131 Fed. 161, 66 C. C. A. 469, 69 L. R. A. 653. He required the plaintiff to satisfy the jury of the existence of specific acts of negligence. He went further

and rehearsed at some length the precautions which the defendant had undertaken, referring to La Provence as a "well-ordered, well-equipped, and well-conducted ship," telling the jury that they were justified in finding that, "like any other steamer in the business, it was in a general sense properly conducted." In his latest reference to the degree of care, after he had called attention to the difference between assaults when obeying orders and purely wanton ones, he described it as "the highest degree of care which (defendant) can reasonably be required to exercise for the safety and protection of (passengers) against such an assault as this."

From a careful study of the whole charge (there are several exceptions to isolated parts of it), we have reached the conclusion that Judge Holt was apprehensive that the distressing circumstances attending the assault might prejudice the jury. Therefore he was most careful, even at the risk of giving some sound exceptions to plaintiff, to impress upon the jury that there could be no recovery unless the proofs showed some specific neglect in exercising that degree of care which reasonable prudence would require of a carrier obligated to be watchful and vigilant to protect its sleeping passengers.

The charge was favorable to defendant, and we are satisfied that the verdict was not induced by any undue conception of the carrier's duty in that regard; it finds abundant support in the undisputed facts. It may be assumed that it was a prudent regulation, which forbade the distribution of stateroom keys among hundreds of passengers, about the antecedents of many of whom the carrier had no information and which left the single key which controlled the connecting doors of a group of staterooms in the hands of one trusted employé. But when that key was lost on board ship, with the possibility that it might be found by some one, and when it was not returned, a circumstance tending to indicate that the finder (if there were one) was keeping it for ulterior purposes, it would not be surprising if the jury reached the conclusion that a man of reasonable prudence would overhaul the locks so that they would be controllable by the new pass-key but not by the lost one.

[3] So, too, the precautions taken for policing this group of staterooms were no doubt all that could be required, if they were carried out. Instant communication from stateroom to buzzer and bell-board, ceaseless watch, by successive reliefs, all through the night, of the bell-board signals, and of the two intersecting corridors on which these staterooms opened; the watchman being so stationed that both were at all times open to his view. If a trusted watchman were there all the time, as the rule required, discharging the duties intrusted to him, it is difficult to see how this assault could possibly have been accomplished. He could not have failed to detect Lamure walking through the corridor and, knowing that his place was then in his sleeping quarters two decks below, would have been put on guard. He would have been at once conscious of the disappearance of the lights in the cross corridor, directly in front of him, and would have investigated the cause. These lights were obviously switched off by Lamure before he finally entered the adjoining stateroom; he had to be in the corridor to reach

the switches. The policing precautions were admirable, on paper; but if the trusted watchman deserted his post of duty or slept on it the precautions were, for the time, withdrawn. Desertion of such a post of vigilance or sleeping on it is certainly negligence, on the part of the watchman, and, for his negligence in failing to execute his employer's orders, the employer is responsible, if such neglect be a cause of injury to a passenger. That the assault on plaintiff occurred because, for the time being, the precautions devised to prevent such an occurrence were not carried out there can be no doubt upon the proof.

[4] It is next contended that a verdict should have been directed for defendant upon the ground of plaintiff's contributory negligence in not examining the bolt on her side of the connecting door when she last entered her stateroom. That question was one for the jury to pass upon. Among defendant's written requests was one that "if plaintiff's negligence contributed to her injuries she could not recover." After the charge, in which many of defendant's requests had been substantially incorporated, defendant asked for an exception to each of the requests not charged. The court declined to allow such a general exception and told counsel that, if there was any request not passed upon, it should be called to his attention and he would pass upon it. Several of the requests were then called to his attention, but not this one. Irrespective of this technicality, however, we find no merit in the proposition that when a passenger has ascertained upon reaching her stateroom that the connecting door is locked, and is further informed that no keys are issued to passengers, she is under an obligation carefully to inspect the fastening of the connecting door every time she returns to her stateroom after a temporary absence.

[5] Error is assigned to the admission of testimony as to the condition of plaintiff's heart. Evidence about her heart by another physician had already been admitted. Injury to the heart was not allowed as an independent ground for recovery and might well be included in the general language as to damages. Permanent nervous injuries were charged in the complaint; the testimony as to the heart was merely incidental.

[6] Exception was reserved to two hypothetical questions. To the first of these the only objection was that it "does not contain all the facts," but no statement was made as to the respect in which it was deficient. When such long hypothetical questions are under consideration, it is unfair to the trial judge to except in such general terms, without indicating in what respects the question contains too little or too much. The second question was badly expressed, but it did not, as defendant contends, require the witness to weigh the evidence of the other doctor and to say whether the witness agreed with him.

We find no merit to the contention that the court erred in admitting evidence of some items of disbursement for care and attendance; we think they were sufficiently pleaded; the complaint enumerates some expenditures which, "among others," she was compelled to make; these trifling little items are some of the "other disbursements"; it would be a waste of time to discuss these trivial items of disbursement.

[7] It is assigned as error that testimony was admitted as to men-

tal pain; that for a long time plaintiff feared to be alone after the assault; that she was distrustful of everything and everybody, etc. Some of this testimony came in on cross-examination. Mind and body are closely connected. The network of nerves which is spread over our bodies, connecting with the brain, are susceptible of traumatic injury which, long after the cause has ceased, may leave serious effects behind them, which might not be there if the mere appearance of a threatening figure with mask and rope had not been accompanied with a brutal mishandling of the nerves themselves. A fair description of the plaintiff's condition after the assault necessarily involved the recital of her mental condition. Defendant, however, was abundantly protected by the charge of the court who instructed the jury that:

"The fact that the remembrance of this occurrence causes her emotion is not alone anything for which you can give money compensation. But, if it affected her nervous condition as a matter of health, then that is what you may consider."

Plaintiff testified as to the sort of trip she expected to take in Europe, a trip which this assault brought to an end, but defendant itself brought the testimony out on cross-examination.

We find nothing to call for consideration in the remaining assignments of error.

Judgment affirmed.