**UNITED STATES v. PULLIG.**

No. 9535.

Circuit Court of Appeals, Eighth Circuit.

Jan. 19, 1933.

George T. Sullins, Asst. U. S. Atty., of Ft. Smith, Ark. (William N. Ivie, U. S. Atty., of Ft. Smith, Ark., and W. C. Pickett, Atty. Veterans' Administration, of Washington, D. C., on the brief), for the United States.

Wade Kitchens, of Magnolia, Ark., for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

GARDNER, Circuit Judge.

This is an action to recover on a contract of war risk insurance.

James Lawson Pullig, the insured, enlisted in the United States Army December 15, 1917, and was discharged August 18, 1918, on a surgeon's certificate of disability because of dementia præcox, and poor physical condition. It is alleged in the complaint that while plaintiff's insurance was in full force and effect he had become totally and permanently disabled, and unable to follow continuously a substantially gainful occupation, in that "plaintiff's mind was affected and circu-lation has been and is bad and he is always cold, and his stomach is diseased, his bowels are in such condition that they slough off, and he suffers at all times, and by reason of his condition is nervous and unable to sleep and unable to eat solid food, and suffers from other diseases unknown to plaintiff." The insurance was in force until January 31, 1922.

At the close of all the evidence, the government moved for a directed verdict, which the court overruled. The court in its instructions withdrew from the jury the question of disability resulting from the mental condition of the insured, but submitted to it the question of his physical disability. The jury returned a verdict in favor of the plaintiff, and the government has appealed, assigning as error the action of the lower court in refusing to grant its motion for a directed verdict.

Medical witnesses called on behalf of the insured testified that he was afflicted with an ailment called colitis, an inflammation of the colon. His own testimony indicates that he has been afflicted with this trouble since 1919. It has from time to time caused him to have abnormally frequent bowel movements, accompanied by pain and suffering. These attacks might last several days, followed by a period of freedom from them. There was testimony that he suffered from headaches, poor circulation, nervousness, passage of blood and mucous, and that he seemed easily to fatigue. Lay witnesses gave their opinion that he was unable to work at times. Three physicians were produced as witnesses on behalf of the insured.

Dr. Kitchens testified that insured came to see him in 1923, a year after the policy had lapsed. He complained of bowel trouble, and wanted the doctor to fix him something for it. The doctor made no examination, but prescribed something for temporary relief. Insured returned a time or two thereafter to see this doctor, and reported that the medicine had not helped him. The doctor expressed the opinion that he was not physically able to work. On cross-examination he testified: "Q. You would also say, Doctor, that you do not think he is totally and permanently disabled? A. Yes, I say that."

On redirect examination he was asked: "Q. If total disability under the law is such an impairment of mind or body as renders it impossible for a disabled person to follow continuously any substantially gainful occupation, if that be total disability, in this case would you say he was totally disabled?" His answer was: "I would."

Dr. Souter testified that the insured came to him in March, 1922, some three months after the policy had lapsed, with reference to a rectal abscess. He told this physician that he had colitis, but the doctor did not examine him for that. Insured returned occasionally later to get something for relief of colitis. On direct examination this witness testified that from what he saw or observed of insured he did not think he was physically able to work, but on cross-examination he said he based that on the fact that insured came to him in 1922 with a rectal abscess.

Dr. Agnes Jackson, insured's sister, was called as a medical witness. While she purported to give some medical testimony with reference to the insured's condition in 1919, it appears that she did not graduate from a medical school and was not admitted to practice medicine until 1924, and had never been admitted to practice in the state of Arkansas. Her testimony is very indefinite as to the time to which it refers, but, without giving the time to which her testimony refers, she in part testified as follows: "In my opinion he was suffering from colitis. Colitis is an inflammation of the colon. * * * I consider it purely of nervous origin. * * * Colitis is not always permanent. It could be chronic. When it is brought on by nervous trouble as his is, I find it chronic. In my opinion it is a permanent condition. It has been so for about ten or twelve years at least. * * * Whether colitis can be cured is owing to the origin. There are two forms at least. He has a continuous form, we call that chronic. The acute form is not of such long duration. Inflammation of the colon continuously makes a chronic case. It was nervous trouble in his case."

She testified that she had given the insured a thorough physical examination, but had never given him any treatment, and she expressed the opinion that he was not able to work. When she made this examination does not appear, but, as she was not a practicing physician until 1924, we must assume that the examination was made after that date.

Dr. Pat Murphy, called as a witness for the defendant, testified that he had examined insured seven times, the first time in March, 1920, and the last in November, 1927, but all of his examinations were as to insured's mental condition. He testified, however, that colitis was a curable disease under proper treatment.

After his discharge from the Army, and until September or October, 1919, insured was in the State Hospital for Nervous Diseases at Little Rock, Arkansas. Following this he lived for about a year at De Queen, Arkansas, where he worked in a cleaning and pressing shop for about six months, having contracted to buy a third interest. He was to have a salary of $100 a month if the business made it, but he in fact made between $50 and $60 per month. In November, 1920, he married. Later he went to Houston, Tex., for examination, remained there about four months, and returned to Waldo, Ark., in 1921. He then went to work in an auto repair shop, and then again entered the cleaning and pressing business. He said that he was unable to work in the auto repair shop. From 1921 to 1928 continuously, he ran a cleaning and pressing business in Waldo, which, he testified, averaged him a profit of $40 to $65 a month. In 1928 he sold his business and went to Shreveport, La., where he worked for a short time as an auto salesman, but within a year he returned to Waldo, Ark., where he has been engaged in the cleaning and pressing business on his own account, making, he testified, an average of $35 to $40 a month. Concerning his work at De Queen, where he seems to have commenced work in September or October, 1919, he testified as follows: "I would go down in the morning, go out and get clothes in that Ford and bring them in. * * * When we carried the clothes we did not have to collect any money unless they wanted to pay. I drove the car. The trips we had to make were made at a distance of ten or twelve blocks. Driving a car seemed to make me weak. Sometimes I would go out and take my time. I did not want my partner to know that I was not really stronger than I was. Sometimes I was gone longer than was necessary. I would feel able to drive and bring the work in. I did not do any very hard work. I was not able to do any. * * * Whenever I get so weak that I am not strong enough to try to do anything, I keep off my feet. I try to keep as cool as possible. If I get a little warm that starts the poisons in my stomach. It weakens me and makes my thinking slow. It prevails all the time but is worse when I am on my feet."

As to his shop equipment and later activities, he testified that his equipment consisted of a pressing machine, two or three tubs, some brushes and soap, and a cleaning solution. Besides cleaning and pressing, he made alterations and took measurements for men's clothing and sent them in. He testified concerning his practice as follows: "I am in and out of the shop practically all the time except once in a while when I feel worse.

Every week or so I do not feel able to go to the shop. I am off from a day to a couple of days. I am there the bigger part of the time. I am not there 90% of the time. I would be off a day or two each two weeks. I am the general overseer of the plant and look out for the business so far as the working part of it is concerned. I look after the financial end of it."

In later years his wife kept the books, and he has had the help of a man in the shop all the time.

Fay Jarnagan testified that he had worked for insured three months in 1927; that he did most of the work of pressing and cleaning. On cross-examination he testified as follows: "He (Pullig) worked while I was there. He did not run the presser, I ran it myself. He did the book work and the machine work. He did not collect the clothing. I did that myself. He used the machine. He altered clothing and changed them and took measurements for suits, collected, and kept the books, and did some of the pressing."

Other witnesses who had worked for insured at times, and others who had observed him, testified to his doing pressing, collecting clothes, keeping books, and collecting bills. They testified that his work was interfered with by his bowel trouble and nervousness.

On behalf of the government, G. C. Dennis testified that he had worked for insured at Waldo in 1925; that he did the cleaning and part of the pressing, and general delivery, but that insured pressed and did the altering; that insured made $150 a month if he collected it all.

A Mr. Neal who purchased the shop at Waldo from the insured and took it over in January, 1929, testified that the first month he ran the shop he took in $375, a part of which was profit, and that insured showed him his books for three or four months previous, and they showed a monthly profit of $150 to $180.

A Mr. Phillips testified that he had worked for insured, and that insured did the bookkeeping, a greater part of the altering, and some pressing, and that the shop took in $250 to $275 per month, with expenses running about $100 a month.

While the evidence on behalf of the plaintiff was somewhat indefinite and uncertain as to time, it was, we think, sufficient to sustain the verdict of the jury to the extent of showing a permanent disability, which existed before the lapse of the policy, and which was at the time a permanent condition. The question is, therefore, whether the disability occasioned by the colitis was a total disability. Total disability, as frequently defined by this court, is any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation. United States v. Phillips (C. C. A.) 44 F.(2d) 689; United States v. Le Duc (C. C. A.) 48 F.(2d) 789; McNally v. United States (C. C. A.) 52 F. (2d) 440; United States v. Perry (C. C. A.) 55 F.(2d) 819, 821; United States v. Hairston (C. C. A.) 55 F.(2d) 825; United States v. McGill (C. C. A.) 56 F.(2d) 522; Green v. United States (C. C. A.) 57 F.(2d) 9; Eggen v. United States (C. C. A.) 58 F.(2d) 616; United States v. Fly (C. C. A.) 58 F. (2d) 217; Proechel v. United States (C. C. A.) 59 F.(2d) 648. The occupation pursued by the insured has been reasonably gainful. In considering whether the disability is total, it is necessary to determine the meaning of "continuous," as used in the definition of what constitutes total disability. Total disability is not necessarily disproved by the fact that the insured may have done some work. United States v. Phillips (C. C. A.) 44 F.(2d) 689; United States v. Harth (C. C. A.) 61 F.(2d) 541, 544.

In United States v. Harth, supra, Judge Van Valkenburgh, speaking for this court, said: " * * * Ability to work means a capacity that may be exercised without serious peril to the life or health of the assured, United States v. Phillips (C. C. A. 8) 44 F. (2d) 689; Carter v. United States (C. C. A. 4) 49 F.(2d) 221, 222, 223; or without the risk of substantially aggravating the ailment with which he is afflicted."

There is no evidence in this record tending to show that the work which the insured has done imperiled his life or health, or aggravated in the slightest degree his ailment. At the end of eleven years from the date of the lapse of his policy, his health seems to be quite as good as at the beginning of that period, and his ability to work has not been diminished in any degree. In fact, there is no suggestion in the evidence that he would not have suffered from his ailment to the same extent had he remained in idleness. There were interruptions in his work which handicapped the insured, but, aside from these interruptions, he has constantly pursued, over a period of eleven years, a substantially gainful occupation. It cannot be said that insured has been able only to work

spasmodically, with frequent interruptions or change of jobs made necessary by his condition as said by this court in United States v. Phillips, supra.

While total disability does not mean that the disability must be 100 per cent. total, neither does the term "continuous" imply ability to work at a substantially gainful occupation absolutely all the time. The most robust and active person does not do that. As said by this court in United States v. Perry, supra, in an opinion by Judge Kenyon: "The word 'continuously' in the definition surely does not mean every day or some definite fixed period as a year or a month, but rather means a substantial portion of time, and, if a party can pursue a gainful occupation for a substantial portion of time as compared with the labor and intensity of work of others in similar lines, he is not totally disabled. There is really no such thing as continuous labor. Holidays, sicknesses, recreation periods, week-ends, all are breaks in the continuity of one's occupation, but would not necessarily destroy its continuity."

■■■ The liability of the government is contractual, and that contract provides for payment to the insured for total and permanent disability occurring during the life of the policy. It did not insure against partial disability. The fact that witnesses expressed the opinion that insured was totally disabled does not overcome the undisputed facts showing that the insured actually worked with sufficient regularity that substantial earnings resulted therefrom, even though he suffered interruptions in carrying on his business and discomfort in so doing. Such opinions cannot be accepted as constituting substantial evidence. United States v. Harth (C. C. A.) 61 F.(2d) 541; United States v. Fly (C. C. A.) 58 F.(2d) 217; Nicolay v. United States (C. C. A.) 51 F.(2d) 170, 173; United States v. Peet (C. C. A.) 59 F.(2d) 728; United States v. Wilson (C. C. A.) 50 F.(2d) 1063, 1064; United States v. Lyle (C. C. A.) 54 F.(2d) 357; United States v. Martin (C. C. A.) 54 F.(2d) 554, 556; Long v. United States (C. C. A.) 59 F.(2d) 602; United States v. Barker (C. C. A.) 36 F.(2d) 556; Nalbantian v. United States (C. C. A.) 54 F. (2d) 63; United States v. Hairston (C. C. A.) 55 F.(2d) 825; United States v. Rice (C. C. A.) 47 F.(2d) 749.

As said by the Circuit Court of Appeals of the Fourth Circuit, in United States v. Wilson, supra: "How can it be said that a man is not able to follow any substantially gainful occupation when he does work under practically continuous employment for a period of about eleven years, and is so working immediately preceding the day of the trial?"

In United States v. Martin, supra, the court, referring to the insured's disability, said: "It has caused him suffering and disability and has to some extent handicapped him in business; it has not at all prevented him from following occupations by which he has earned his livelihood."

Again in that opinion the court said: "These decisions all give to the terms the practical common-sense meaning that one is totally disabled when he is not, without injury to his health, able to make his living by working."

In Nicolay v. United States, supra, the court said: "Like any other question of fact, the subsequent employment may be of such duration, and be of such a nature, that it conclusively refutes any idea that the insured might have been permanently and totally disabled prior to and during the employment."

In United States v. Rice, supra, the court said: "But we feel constrained to hold that the manual labor performed by the appellee for the period of five years following his discharge from the army and the compensation received for his services are utterly inconsistent with his present claim that he was totally and permanently disabled before the policy lapsed."

The court is not at liberty to award the insured compensation commensurate with his disability, because under the terms of the insurance contract plaintiff is entitled to recover only in the event that he became totally disabled during the life of the policy. The law with which we are here dealing is the law of contracts. Under existing laws he is entitled to compensation commensurate with his disability; and we may assume that he is being so compensated; but such compensation must be awarded by Congress and not by the courts.

The judgment appealed from is therefore reversed, and the cause remanded for further proceedings consistent with this opinion.