## UNITED STATES v. NICKLE.
### No. 9770.

Circuit Court of Appeals, Eighth Circuit.
March 23, 1934.

874

Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C. (William L. Vandeventer, U. S. Atty., and Claude E. Curtis, Asst. U. S. Atty., both of Kansas City, Mo., and John M. George, Atty., Department of Justice, of Washington, D. C., on the brief), for the United States.

L. W. Eubanks, of Monett, Mo., for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MARTINEAU, District Judge.

GARDNER, Circuit Judge.

This is an action brought to recover on a war risk insurance contract. Recovery is sought on the ground that insured became permanently totally disabled during the life of the policy. The policy lapsed for nonpayment of premiums June 1, 1919. Appellee was plaintiff below, and we shall refer to the parties as they appeared in the lower court.

The petition of plaintiff is in conventional form, and the answer, aside from certain specific admissions, is in the nature of a general denial. At the close of all the evidence, defendant moved for a directed verdict, which was denied. Submission to the jury resulted

in a verdict in favor of plaintiff, and from the judgment entered thereon this appeal has been perfected.

It was admitted at the trial that plaintiff entered the military service of the United States May 29, 1918, and on June 13, 1919, he was honorably discharged; that on June 1, 1918, he applied for and was granted war risk insurance in the amount of $10,000, the monthly premium on this insurance being $6.60; that the premiums were paid to the month of June, 1919; that the premium which became due July 1, 1919, was not paid, and that no premium payments have since been made. It was also admitted that on May 22, 1930, plaintiff made demand on the government for payment under his contract of insurance; that this demand was denied July 9, 1930; and that a disagreement therefore exists between plaintiff and defendant.

The case was before us on appeal from a former judgment in favor of plaintiff, and we reversed the judgment on the ground that the court had erred in admitting the testimony of a medical expert witness whose testimony was based upon his personal examination of the insured which was made solely for the purpose of enabling the physician to testify. United States v. Nickle (C. C. A.) 60 F.(2d) 372.

Two questions are presented on the present appeal: (1) The alleged error of the court in permitting Dr. Francis B. Camp to answer certain hypothetical questions, and (2) the alleged error of the court in denying defendant's motion for a directed verdict.

A number of hypothetical questions were propounded to plaintiff's witness, Dr. Francis B. Camp. These questions purported to embody all the material facts shown by the evidence bearing upon the question of the insured's physical condition as to being permanently totally disabled. The assignment of errors does not embody the objections which were interposed, but simply recites that, "In answer to this question, Dr. Camp was permitted, over the objection and exception of the defendant, to state the following." Then appears the answer of the witness. What the objections were is not indicated, and it is impossible to determine from an examination of the assignment whether or not the court committed error in its rulings. There is no reference to the printed pages where the questions, objections, rulings, and answers are to be found, but we are left to grope about through the record in search for the alleged errors. It is the duty of counsel for appellant to point out and call to the

court's attention the specific errors complained of, and this should be done by the assignment of errors. The assignment in question does not fulfill this function, but is defective not only in form, but in substance. As said by the Supreme Court in Local 167 of International Brotherhood of Teamsters, etc., v. United States, 291 U. S. 293, 54 S. Ct. 396, 398, 78 L. Ed. ——, "They do not appropriately serve the convenience of the appellee or of the court." Rules 11 and 24; Wagner Electric Corp. v. Snowden (C. C. A. 8) 38 F.(2d) 599, 601; Federal Surety Co. v. Standard Oil Co. (C. C. A. 8) 32 F.(2d) 119; Lahman v. Burnes Nat. Bank (C. C. A. 8) 20 F.(2d) 897; Robinette v. Sidener (C. C. A. 8) 33 F.(2d) 37; Schmidt v. United States (C. C. A. 8) 63 F.(2d) 390.

In Wagner Electric Corp. v. Snowden, supra, in considering certain assignments challenging the rulings of the court on the admissibility of evidence, we said:

"In none of these assignments is the substance of the evidence admitted or rejected set out. Neither do the assignments show what objections were interposed. It is commonplace to state that the alleged error assigned must be sufficiently specific so that the court may understand the same without being forced to search the record to determine what the issue is."

■ But we have searched the record to ascertain at least the substance of the objections interposed to these hypothetical questions. Generally speaking, they were to the effect that all of the facts were not contained in the question. The court then asked counsel to disclose what facts he claimed had been omitted, and so far as counsel pointed out any such omissions, the court required counsel for plaintiff to supply them. Where complaint is made that the court erred in overruling an objection to the admissibility of evidence, it is generally essential that the objection definitely and specifically state the grounds on which it is based so that the court may intelligently rule upon it. In other words, the appellate court will not reverse on a ruling which overrules an objection to testimony, unless a good objection has been made, even though the testimony might have been objectionable on grounds not specifically and sharply called to the court's attention. The rule is otherwise where the court excludes evidence on a general objection. If the evidence is excluded on objection, the question on appeal is not whether the objection as made was technically a good objection, but whether the ruling excluding the evidence was justified on any ground.

■ Here, the objection to the hypothetical question was to the effect that the question omitted necessary facts, but it did not point out what necessary facts were omitted. The object of making objections is presumably not solely for the purpose of laying the foundation for reversible error, but to enable counsel propounding the questions to avoid error, and to enable the court intelligently to pass upon the question presented. Here, had counsel for defendant pointed out any proven facts which he claimed were omitted from the hypothetical question, counsel for plaintiff might readily have supplied them. These objections were of no avail, either as an aid to the trial court, or as laying a foundation for the alleged error now urged in this court. United States v. Nickle (C. C. A. 8) 60 F. (2d) 372; Wabash R. Co. v. Lewis (C. C. A. 8) 48 F.(2d) 519; Compagnie Generale Transatlantique v. Rivers (C. C. A. 2) 211 F. 294; Quaker Oats Co. v. Grice (C. C. A. 2) 195 F. 441; Pyle v. Kansas City Light & Power Co. (Mo. App.) 246 S. W. 979; Beall v. Kansas City Rys. Co. (Mo. App.) 228 S. W. 834; Pullman Co. v. McGowan (Tex. Civ. App.) 210 S. W. 842.

The ruling of the court in denying defendant's motion for a directed verdict at the close of all the testimony raises a more serious question.

■ Is there any substantial evidence on which the verdict may properly be predicated? We must assume as established all the facts that the evidence supporting plaintiff's claim reasonably tends to prove, and there should be drawn in favor of plaintiff all the inferences fairly deducible from such facts. Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720.

Plaintiff, as a witness in his own behalf, testified in substance that before joining the army he was a farm laborer, strong, and able to do any kind of farm work. After three months training at Camp Dodge, Iowa, he was sent to France, where he remained five and one-half months, during which time he had the flu and as a result was in the hospital for about a month in October or November, 1918. After he had the flu, he was put out on drill and fell out on account of heart trouble. He was sent to the doctor and taken out of drill, and that was the last time he ever drilled. Returning from France, he landed in New York, and thence came to St. Louis, Mo. En route from New York to St. Louis he "had

a spell" with his heart on the train. "It ran fast, just kind of beat and pounded." At Jefferson Barracks, when he came in line for discharge, he was stopped and taken to the hospital and aspirated, and there were three quarts of fluid taken off him at one time, and a pint at another. He was in the hospital about four months, and he was confined to his bed for about a month after he was aspirated.

When he was discharged from the hospital, he went to his father's farm at Purdy, Mo., where he stayed for a time and then went to Drumright, Okl., where he worked for about fifteen or twenty days in the fall of 1919, but had to quit the job on account of ill health. His heart bothered him there the same as it had in France. He returned to his father's farm, remaining there five or six months doing nothing, and after that period, he returned to Oklahoma in the spring of 1920, and worked there a little over a month and again had to quit because of the same heart trouble. He again returned to his father's home, remaining there some two or three months. In the fall of 1920, he went to Slick, Okl., where he worked around the oil fields for a month or a little over. During that time he was again afflicted with heart trouble, and he returned home where he remained until he went to Mountain Grove, Mo., where he was placed in vocational training for nine months. The work in vocational training was "mostly studying books and something like that." Before taking this training, his education was about the fifth or sixth grade in the public schools. After his training, he returned to Purdy, Mo., and was put on a project taking care of "a couple of hundred chickens." He did part of the work and his wife did the rest. At that time he was sleeping badly, and has had restless nights practically ever since he got out of the Army. He sleeps with his head high so he can breathe better. He lived on a little forty-acre place but has not farmed it, but rented it out. There were some truck patches on it for his own use which he hired tended, and his wife did part of the work on this garden. When he lies down, unless his head is raised, he has coughing spells, and he has to get up and walk the floor half the night, and he has restless spells off and on all the time, with night sweats. They first began on him at St. Louis while in the hospital, and they have lasted off and on until the present time. They come at intervals and last three or four nights. From the time he was in the hospital at Jefferson Barracks he has had a cough. There will probably be six months

in the year that he will not cough, and then for a long period he would cough.

Lay witnesses, who were neighbors and acquaintances of plaintiff, testified that they saw plaintiff very early after his return from the service, some of them having seen him upon his return, others the first week after his return, and some a little later. They testified generally that he appeared to them to be sickly, weak, slow in movements, and that he had a cough. One witness testified that on one occasion he coughed excessively at the time he was undertaking to repair his automobile. One witness testified that he was in the service with plaintiff and was with him when he fell out in training in France. He came back with plaintiff and helped take care of him. This witness says he was in a weakened condition, was pale looking, and had a cough; that he left him at the hospital at Jefferson Barracks, and when he again saw him, after he had been discharged from the hospital, he was thin, had bad color, and looked as though he was in bad shape. Other of these witnesses testified that they noticed that he was weak, short of breath, and coughed. Another witness testified:

"I recall the occasion of his return to Purdy after the war, seen him two or three days after he came home. He looked mighty pale and weak to me. I observed he was quite a bit changed from what he was before he went; he was weak and pale and nervous and coughed, kind of tight, hacking cough— short of breath. Right after he built the chicken house on his place he sent for me to come over to write some fire insurance. We walked back to his house and he was short of breath. My farm joins his father's farm, and I would see him pretty often; the last years it got so I saw him nearly every day."

Another witness testified that he had known him ever since he was a small boy, and that he saw him on his return from the Army in the spring of 1919, the day he came home; that "he looked pale; he didn't look healthy, and looked pale and short of breath. When he started to work he would do a little and then have to stop and get his breath; didn't have any breath to do the work. I lived right close to him all the time until he was to the training school, and what time he wasn't in Oklahoma I saw him every week, and sometimes three or four times. * * * On all occasions when I saw him he just looked pale and bad and unhealthy."

Other lay witnesses testified to similar facts.

The records of the hospital at Jefferson

Barracks were offered in evidence. These show that plaintiff was admitted to the hospital February 10, 1919. His ailment was diagnosed as "pleurisy with effusion, left lung." On February 11, there was an aspiration of the left chest, and on February 16 an aspiration of the left chest. Under the heading, "Clinical Record, History of present disease," appears the following:

"February 10, 1919. Pt. had 'flu' in November 1918. Was sent to duty after a 2 weeks illness. About 2 weeks ago he began to feel 'rocky.' Could not take a deep breath or exert himself for any length of time. Thought he had fever. When he was examined for discharge at this post, an absence of voice sounds was noted. Sent to hospital and was admitted.

"X-ray showed heart pushed over to right and left side opaque."

Under the heading, "Objective Symptoms," appears the following:

"Entire left side of chest flat on percussion. Vocal and tactile fremitus both absent. X-ray shows left side opaque and heart pushed over to right.

"T. 101. 8, P. 88, R 18 Patient has slight cough and difficulty in taking a deep breath. * * * Suspicious of fluid in left side of chest. * * * General condition: T. B. * * *

"Feb. 11, 1919. Patient aspirated. Needle inserted in 7th interspace just below angle of left scapula. About 5000 cc of clear greenish serum (not pus) obtained. Patient began to cough and sweat some after about 4000 cc had been aspirated."

The Radiographic Report of the Clinical Record contains the following:

"Laboratory X-ray, May 16, 1919.

"X-ray findings: Stereoscopic examination of chest shows a somewhat diminished radiancy of lower third of left chest. Indicative of provably fluid. The shadow of the left diaphragm is obscured. There appears to be a comparative enlargement of the left ventricle. The entire left hemi-chest is slight less radiant than the right. There is extension into the apex of the left vertebral and in the first and (a) second interspaces the corresponding mainstem bronchi reach into the periphery. The right first mainstem bronchis is delicately fanned in the third zone. This case should be considered as active, with the greatest activity on the left; prognosis is good with adequate treatment. There is little if any destruction of lung tissue. The trachea appears pushed a trifle to the right. There is nothing on the plates to account for this."

Three physicians testified for plaintiff. They were Dr. Kelly, Dr. Miller, and Dr. Camp. Dr. Kelly testified that he first examined plaintiff in the early part of 1921; that it was his opinion from his examination that plaintiff was then suffering from active tuberculosis; that he suspected at the time of this examination that plaintiff was afflicted with mitral stenosis. Dr. Miller testified that he had examined plaintiff in 1931, and again just preceding the trial. Based upon these examinations, he was of the opinion that plaintiff at the time of the examinations had active tuberculosis and active tubercular involvement in the apex of each lung, and that plaintiff was afflicted with mitral stenosis.

Dr. Camp first examined plaintiff in November, 1930, and again examined him before the last trial. At the time of his examinations he found active tubercular involvement in the lungs and also mitral stenosis, and in addition he found that mitral stenosis was complicated by auricular fibrillation. Dr. Camp, in answer to a hypothetical question which embodied substantially all the facts testified to by the other witnesses and the hospital record, gave it as his opinion that as early as May, 1919, plaintiff was suffering from active tuberculosis, not of the lungs, but of the pleura of the lungs; that at that date he was suffering from mitral stenosis complicated by auricular fibrillation; that the disease mitral stenosis was an incurable disease, and if complicated by auricular fibrillation one suffering from it could not engage in physical employment without danger to his life and health. This witness said that plaintiff's case was different from ordinary mitral stenosis because of the presence of auricular fibrillation. The witness said, among other things:

"Auricular fibrillation is a condition in which there is irregular heart action, due to failure or improper impulses coming from the upper portion of the heart not getting to the lower portion, improper in the normal rotation of the heart beats, which happens most frequently in mitral stenosis. That is one complication of mitral stenosis we do not like, the one that is disabling. It comes from over-exertion of the heart muscles that lead into the upper chamber, but where there is mitral stenosis with evidence of retarded fibrillation, or that irregular heart action, that individual has decompensation, and with decompensation exercise or exertion should not be done, because of the type or trouble we call mitral stenosis. In other types of con-

dition, other types of trouble, not mitral stenosis, exercise might be done to some extent, but mitral stenosis being an incurable thing and not relieved by treatment or rest or anything else, we think exercise is not the thing for a person suffering with mitral stenosis."

The court's instructions were not excepted to, nor did either party request any instructions, so that the instructions as given became the law of the case. Security Life Ins. Co. v. Brimmer (C. C. A. 8) 36 F.(2d) 176; Travelers' Ins. Co. v. Schenkel (C. C. A. 8) 35 F.(2d) 611; Hard & Rand, Inc., v. Biston Coffee Co. (C. C. A. 8) 41 F.(2d) 625; Yelloway, Inc., v. Hawkins (C. C. A. 8) 38 F.(2d) 731; Fidelity & Casualty Co. v. Niemann (C. C. A. 8) 47 F.(2d) 1056; Skaggs Safeway Stores, Inc., v. Dunkle (C. C. A. 8) 49 F.(2d) 169; Aetna Casualty & Surety Co. v. Reliable Auto Tire Co. (C. C. A. 8) 58 F.(2d) 100; Fricke v. General Accident, Fire & Life Assur. Corp. (C. C. A. 8) 59 F.(2d) 563.

The burden of proof was, of course, on the plaintiff, and the court so instructed the jury. His long delay before bringing this suit was strong evidence that he was not permanently totally disabled before his policy lapsed, but it was not conclusive evidence, and hence, it was a question to be submitted to the jury under proper instructions, and if counsel for defendant was not satisfied with the instruction as given, he should have requested an instruction specifically presenting this question to the jury. The fact too that plaintiff took vocational training has been said by this court to be inconsistent with the claim that he was permanently totally disabled. But it cannot be said as a matter of law that the taking of vocational training absolutely precludes recovery, and that being true, the question was one to be presented to the jury on proper instruction; and here again, counsel for defendant requested no special instruction on this question. The work record is very meager, and is not inconsistent with the claim of permanent total disability.

It is urged by counsel for defendant that the testimony of Dr. Camp was insufficient to warrant the submission of the case to the jury, and it is asserted that this witness did not testify that mitral stenosis, found on his examinations in 1930 and 1932, was then totally disabling, and that he did not testify to the degree of disability of plaintiff at the time of his discharge from the Army, but that in effect his testimony went no fur-

ther than to express the opinion that the condition of mitral stenosis with auricular fibrillation existed, and that the condition was disabling. We think this contention is not sustained by the record. It was not the opinion of Dr. Camp that one with mitral stenosis was necessarily totally disabled. True, he and all the other medical witnesses, both for the plaintiff and for the government, testified that this ailment was incurable, and it was therefore permanent; but his testimony was to the effect that when this incurable disease was complicated by auricular fibrillation it was disabling, and that any physical exertion was detrimental to health and dangerous to life.

In denying defendant's motion for a directed verdict, interposed at the close of plaintiff's testimony, the court, in an oral opinion, among other things said:

"But Dr. Camp did testify, in answer to a hypothetical question which stated to him facts that were in evidence, and to which hypothetical question there was at the last no objection, excepting that it was not a sufficient statement of facts to enable the witness intelligently to answer it, Dr. Camp did testify that in his opinion the plaintiff, at the time of his discharge from the Army in June, 1919, was suffering from a disease which he named as mitral stenosis, and he further testified—and here is an important fact that counsel for defendant seems to have overlooked—he further testified that in his opinion at that time this mitral stenosis was complicated by what he described as auricular fibrillation—whatever that may be. He further testified that in his opinion—I think that was not merely an expression of an opinion, but a positive fact—he further testified that mitral stenosis was an incurable disease, was a disease of permanent character, for which there was no remedy, and he further testified —and this I think counsel for defendant also overlooked—he further testified that any kind of physical activity was injurious to a person suffering with the disease of mitral stenosis complicated by auricular fibrillation, and that any kind of physical activity would aggravate that disease."

In submitting the case to the jury, the lower court, in its instructions, among other things again said:

"Now, gentlemen, if that was all of the medical testimony for the plaintiff, you could not from that testimony, even in addition to the lay testimony, find a verdict for the plaintiff, because none of these gentlemen from their examinations pretended to say to you

what was the condition of the plaintiff when he was discharged from the Army on June 1, 1919, which, as I stated to you, is the month and year you must keep in mind, but Dr. Camp, in answer to a hypothetical question in which was stated facts testified to by other witnesses, in basing his answer to that hypothetical question, assuming those facts to be true, gave it to you as his opinion that on June 1, 1919, the plaintiff was suffering from active tuberculosis, he said, not of the lungs but of the pleura of the lungs, which, I understand, is the covering of the lungs. He gave it to you, also, as his opinion that on that date he was suffering from mitral stenosis, complicated with auricular fibrillation, and he said to you that that disease, mitral stenosis, was an incurable disease and if it was complicated with auricular fibrillation that one suffering from it could not engage in physical employment without danger to his life and danger to his health."

As has already been observed, no exception was taken to these instructions, and counsel for the government cannot well now take the position that this witness did not testify that one suffering from mitral stenosis complicated by auricular fibrillation could not engage in physical employment without endangering his life or health. The court twice announced this construction of the doctors' testimony, and counsel, having failed to interpose any exception to this announcement, and having permitted the case to go to the jury on that theory without objection, cannot be permitted to take an inconsistent position in this court.

The insurance contract in this case obligated the government to indemnify in the event of death or permanent total disability during the life of the policy. In the instant case, it was incumbent upon plaintiff to establish total permanent disability before the lapse of his policy. The source of his illness is immaterial, but his illness, injuries, and condition of health before the lapse of the policy, as well as his condition in subsequent years, have a bearing in so far as they may tend to show whether or not the insured was in fact totally permanently disabled during the life of the policy. Eggen v. United States (C. C. A. 8) 58 F.(2d) 616; United States v. Pullig (C. C. A. 8) 63 F.(2d) 379; United States v. Hill (C. C. A. 8) 62 F.(2d) 1022.

The insurance does not cover total temporary or partial permanent disability. While a great deal has been said as to the phrase "total permanent disability," no fixed rule has been established as applicable to all cases, but the circumstances of each case must largely govern in construing this phrase of the contract. As said by the Supreme Court in Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 275, 78 L. Ed. 492, in an opinion by Mr. Justice Butler:

"The various meanings inhering in the phrase make impossible the ascertainment of any fixed rules of formulæ uniformly to govern its construction. That which sometimes results in total disability may cause slight inconvenience under other conditions. Some are able to sustain themselves, without serious loss of productive power, against injury or disease sufficient totally to disable others. It cannot be said that injury or disease sufficient merely to prevent one from again doing some work of the kind he had been accustomed to perform constitutes the disability meant by the act, for such impairment may not lessen or affect his ability to follow other useful, and perchance more lucrative, occupations. Frequently serious physical impairment stimulates to successful effort for the acquisition of productive ability that theretofore remained undeveloped.

"The above-quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed. If read literally, every impairment from time to time compelling interruption of gainful occupation for any period, however brief, would be total disability. And, if such impairment were shown reasonably certain not to become less, it would constitute total permanent disability. Persons in sound health occasionally suffer illness requiring them to remain in bed for a time. It is not inaccurate to describe such illness as 'total disability' while it lasts. But, clearly it is not right to say that, if they remain sound but reasonably certain throughout life occasionally to have like periods of temporary illness, they are suffering from 'total permanent disability.' Such a construction would be unreasonable and contrary to the intention of Congress. 'Total disability' does not mean helplessness or complete disability, but it includes more than that which is partial. 'Permanent disability' means that which is continuing as opposed to what is temporary. Separate and distinct periods of temporary disability do not constitute that which is permanent. The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. He may have worked when really unable and at the risk of endangering his health or life. But manifestly

work performed may be such as conclusively to negative total permanent disability at the earlier time."

Here, we think there was substantial evidence that plaintiff was suffering from a total permanent disability before the lapse of his policy, and that such work as he has done since that time was at the risk of endangering his health or life. United States v. Phillips (C. C. A. 8) 44 F.(2d) 689; Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170.

The judgment appealed from is therefore affirmed.