[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 22, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-15321

_____

D. C. Docket No. 00-02523-CV-JEM

JANE DOE,

Plaintiff-Appellant-Cross Appellee,

versus

CELEBRITY CRUISES, INC., in personam,
ZENITH SHIPPING CORPORATION, in personam,
APOLLO SHIP CHANDLERS, INC., in personam,
CELEBRITY CATERING SERVICES PARTNERSHIP, in personam,

Defendants-Appellees-Cross-Appellants,

BARIS AYDIN, in personam,
M/V ZENITH, her engines,
boilers, tackle, etc., in rem,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(December 22, 2004)**

Before HULL and MARCUS, Circuit Judges, and MILLS[*], District Judge.

HULL, Circuit Judge:

This appeal presents the question of what standard of care governs when a cruise line's crew member sexually batters a passenger. In a pre-trial ruling, the district court determined that a cruise line, as a common carrier, owes a duty of protection and safe transport to its passengers, and thus is strictly liable for crew member assaults on passengers. The jury trial focused on whether the plaintiff consented or was sexually battered by the crew member.

After the verdict and entry of judgment for the plaintiff, the district court <u>sua sponte</u> raised an entirely new issue regarding which of the four defendants actually employed the errant crew member and whether that employer was a common carrier. Soon thereafter, the district court granted a Rule 50(b) judgment as a matter of law to all defendants, concluding that the plaintiff failed to prove any single defendant was both a common carrier and the employer of the crew member

---

[*]Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

and therefore that no defendant was liable for the crew member's assault.

After review and oral argument, we reverse the Rule 50(b) entry of judgment for the defendants because the district court lacked authority to enter judgment under Rule 50(b) on a new ground not raised by any party prior to submission of the case to the jury. We also reinstate and affirm the jury's verdict for the plaintiff because we conclude that under federal maritime law, a cruise line is strictly liable for crew member assaults on passengers during the cruise.

## I. PROCEDURAL HISTORY

On July 17, 1999, Plaintiff Jane Doe, as a passenger on the cruise ship M/V ZENITH, embarked on a one-week round-trip cruise from New York City to Bermuda. During the cruise, Doe reported to the cruise line's medical staff that Baris Aydin, a crew member and Doe's dinner waiter, raped her. The medical staff treated Doe, and the cruise line flew her home from Bermuda on July 21, 1999.

## A. Original Complaint

On July 14, 2000, Doe filed a nine-count complaint against defendants Celebrity Cruises, Inc., Zenith Shipping Corporation, Apollo Ship Chandlers, and against the M/V ZENITH, her engines, boilers, tackle, etc., in rem.[1]

---

[1]Celebrity Cruises, Inc. is the operator of the M/V ZENITH; Zenith Shipping Corporation is the owner of the vessel; and Apollo Ship Chandlers provides certain services and personnel to Celebrity Catering Services Partnership, which in turn provides food and beverage services to Celebrity Cruises' vessels. Doe later added Celebrity Catering Services Partnership as the fourth

Based on Aydin's rape of Doe, the complaint alleged one count each of sexual assault, sexual battery, and negligence, two counts of breach of the contract of carriage, two counts of intentional infliction of emotional distress, and two counts of negligent infliction of emotional distress.[2]

The defendants collectively moved to dismiss the complaint, contending that they are not liable for Aydin's intentional misconduct. Defendants argued that they are liable (1) only for their own breach of reasonable care under the circumstances and (2) only for their employees' intentional conduct while acting within the scope of their employment and in furtherance of the defendants' business purposes.

Denying defendants' motion in part, the district court ruled that a cruise line, as a common carrier, is strictly liable for crew member assaults on passengers. The district court dismissed without prejudice parts of Doe's complaint and allowed Doe to amend her complaint to allege vicarious or strict liability causes of action.[3]

B.    **Third Amended Complaint**

---

defendant.

[2]The original complaint contained allegations about the negligent treatment Doe received from the cruise line's medical staff and security personnel after the rape. These claims are not at issue in this appeal. As noted later, the district court dismissed parts of Doe's complaint with prejudice (including her breach of contract claims), and Doe has not appealed that dismissal.

[3]Doe's complaint also named Baris Aydin, the crew member, as a defendant, but he was never served with process and was not a defendant at trial.

4

Doe amended her complaint three times. Those amendments (1) added Celebrity Catering Services Partnership as a defendant, (2) alleged more specific facts on two theories of negligence, and (3) added four vicarious or strict liability counts. The third amended complaint alleged five causes of action against all four defendants: (1) several theories of negligence; (2) vicarious or strict liability for Aydin's sexual assault of Doe; (3) vicarious or strict liability for Aydin's battery of Doe; (4) vicarious or strict liability for Aydin's intentional infliction of emotional distress against Doe; and (4) vicarious or strict liability for Aydin's negligent infliction of emotional distress upon Doe.

In each strict liability count, Doe alleged that all defendants "are responsible and/or are strictly liable for the acts of their respective employees, servants and/or agents, including defendant Aydin," as follows:

> As a crew member of the M/V ZENITH, Aydin owed a duty to protect and care for the plaintiff's safety. He, instead, deliberately, knowingly and intentionally breached this duty by sexually assaulting, raping and/or battering the plaintiff. . . . Defendants Celebrity, ZSC, M/V ZENITH, Apollo and/or Celebrity Catering are responsible for and/or are strictly or vicariously liable for the acts of their respective employees, servants and/or agents, including defendant Aydin.

After the ruling on the defendants' motion to dismiss and the filing of the third amended complaint, the parties litigated the case as a tort case.

## C. Pre-Trial Stipulation and Trial

5

On October 18, 2002, the parties entered into a pre-trial stipulation. Notably, they stipulated that "[f]or the purposes of the forthcoming trial, the parties will try only those issues relating to the strict (vicarious) liability standard as articulated and ordered by [the district court] in [its] Order dated February 26, 2001." Specifically, the parties' stipulation stated that these issues of fact remained to be litigated:

> A. As to the issue of rape, sexual assault and battery, whether or not the Plaintiff consented to the sexual contact with Aydin.
> B. As to damages, the precise nature and extent of the damages claimed.
> C. The Plaintiff has a cause of action for Intentional Infliction of Emotional Distress. The parties disagree whether this cause of action is subsumed within the strict liability count or whether it should be presented separately at trial.

No one raised a legal or fact issue about which of the four defendants employed Aydin or about whether Aydin's employer was a common carrier. Instead, as to the strict liability claim, the defendants chose to litigate only whether Doe consented to the sexual intercourse and the amount of damages.

The case proceeded to trial, and at the close of the plaintiff's evidence, the defendants filed three separate written motions for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Specifically, defendants' Rule 50(a) motions argued: (1) that as to Doe's intentional infliction of emotional distress claims, Doe failed to show an independent tort (other than the

6

alleged rape) rising to the level of "outrageousness" required under Florida law; (2) that as to the assault and battery claims, Doe failed to provide sufficient evidence from which a jury could find that Aydin intended to batter or assault Doe; and (3) that as to the strict liability claims, "notwithstanding [the pre-trial] ruling . . . that strict liability applies," the "Defendants renew the arguments put forth in their Motion(s) to Dismiss." In other words, the third Rule 50(a) motion renewed their objections to the strict liability standard insofar as it applied to common carriers at all. Again, no defendant ever raised any issue relating to the status of Aydin's employer as a common carrier. The district court granted the defendants' motion for judgment as a matter of law on Doe's emotional distress claims, but denied the other two motions.

At the close of all evidence, the defendants orally "renewed all of [their] previously denied directed verdict motions." The district court denied the defendants' Rule 50(a) motions again and submitted Doe's sexual assault and sexual battery claims to the jury.

As to the sexual battery, the district court instructed the jury that the defendants were strictly liable if Doe proved actual sexual penetration and that "that act" was done without her consent, as follows:

**Sexual Battery**
On Plaintiff's claim for sexual battery, Defendants,

7

> CELEBRITY CRUISES, ZENITH SHIPPING CORPORATION, APOLLO SHIP CHANDLERS, INC., and CELEBRITY CATERING SERVICES PARTNERSHIP are strictly liable to Plaintiff for sexual battery if Plaintiff shows, by the greater weight of the evidence, the following:
>
> That Baris Aydin, with his sexual organ, <u>penetrated or had union</u> with the vagina of Plaintiff; <u>and</u>
>
> <u>That act was done without the consent of Plaintiff.</u>

(emphasis added).  In contrast, as to the sexual assault, the district court instructed the jury that the defendants were strictly liable if Doe proved Aydin (1) "intended to commit a sexual battery" <u>and</u> that "the attempted act" was done without Doe's consent, <u>or</u> (2) "intended to cause the plaintiff to fear a sexual battery" <u>and</u> that "the attempted act" was done without her consent, as follows:

> **Sexual Assault**
> On Plaintiff's claim for sexual assault, Defendants . . . are strictly liable for sexual assault if Plaintiff shows, by the greater weight of the evidence, either:
>
> a) That Baris Aydin intended to commit a sexual battery on the person of Plaintiff; <u>and that the attempted act was done without the consent of Plaintiff</u>; or
>
> b) That Baris Aydin intended to cause Plaintiff to fear an immediate sexual battery or rape; <u>and that the attempted act was done without the consent of Plaintiff.</u>

(emphasis added).  Thus, as charged, a finding of sexual battery required actual penetration without Doe's consent; whereas, a finding of sexual assault required a specific intent to commit a crime and only an "attempted act" without Doe's consent.

8

On November 22, 2002, the jury returned a verdict for Doe on her sexual battery claim, awarded her $1 million in compensatory damages, and allocated fault equally among the four defendants. The jury returned a verdict for the defendants on Doe's sexual assault claim.

When the jury announced its verdict, the defendants immediately sought re-submission of the claims and defenses "in light of the seemingly inconsistent verdict." After hearing argument and reviewing the memoranda filed by the parties on this point, the district court denied the defendants' request to have the jury revisit its verdict. On November 27, 2002, the district court entered final judgment on the verdict in favor of Doe and against all defendants.

### D. Post-Judgment Motions

On December 12, 2002, the defendants filed three separate motions: (1) for remittitur of the amount of the jury verdict, (2) for a new trial based on the allegedly inconsistent verdicts and several allegedly erroneous evidentiary rulings, and (3) for judgment as a matter of law under Rule 50(b). The defendants' Rule 50(b) motion renewed their objections to the pre-trial ruling about strict liability and argued that Aydin's conduct was outside the scope of his employment and that defendants were thus not vicariously or strictly liable for his acts.

Alternatively, even if the strict liability standard applied, defendants argued

9

that strict liability requires an intentional tort and that strict liability could not attach based on Aydin's sexual battery because the court's jury instruction on sexual battery did not include an intent element. According to the defendants, once the jury found for them on the issue of sexual assault (the only one of the two torts that contained a specific intent element), defendants were entitled to judgment as a matter of law.

At the March 18, 2003, hearing on these post-judgment motions, the district court raised, sua sponte, the issue of whether any one of the four defendants was both a common carrier and Aydin's employer, and ordered further briefing on the issue. It is undisputed that at trial the defendants never moved under Rule 50(a) for judgment on the basis that Doe had failed to prove which of the four defendants actually employed Aydin and whether that particular defendant was a common carrier.

On September 23, 2003, the district court entered an order granting the defendants' Rule 50(b) motion for judgment as a matter of law but solely on the new ground that none of the defendants was both a common carrier and Aydin's employer, and that since no defendant met both requirements, no defendant could be liable. The district court also vacated its November 17, 2002, judgment in favor

10

of Doe and entered an amended final judgment in favor of all defendants.[4] The

district court then denied as moot the defendants' other post-judgment motions for

remittitur and for new trial.

Doe appeals from this amended final judgment and the district court's

September 23, 2003, order granting judgment as a matter of law to defendants

under Rule 50(b) based on lack of proof that any one defendant was both a

common carrier and Aydin's employer. Defendants cross-appeal, asserting that the

district court erred in imposing a strict liability standard for crew member assaults

and in denying their Rule 50(a) and 50(b) motions that renewed their objections to

that strict liability standard.

Before examining the issues on appeal, we recount the evidence at trial.

## II. TRIAL EVIDENCE

In July of 1999, Baris Aydin lived aboard the cruise ship M/V ZENITH,

and worked as a ship waiter 16 hours a day, seven days a week. Aydin worked

breakfast, lunch, dinner and the midnight buffet, and served the same set of

passengers at dinner every night for the duration of their cruise.

The defendants mainly utilized a "tipping system" for paying Aydin and

---

[4]Shortly before trial, this case was reassigned to a different district court judge. Thus, the judge who made the pre-trial ruling as to strict liability was different from the judge who presided over the trial and granted the Rule 50(b) judgment as a matter of law for the defendants.

apparently other similarly-situated crew members. Passengers were assigned to the same dinner table and waiter each night. The guests whom Aydin served at his tables left money in envelopes or gave it to him personally. He made $800-$1,000 per week in tips. In addition to tipping him, Aydin's assigned dinner passengers filled out evaluations at the end of the cruise. These evaluations determined how many tables/passengers Aydin was assigned, and therefore how much money he made in tips. Aydin testified that there is a direct relationship between the satisfaction of his passengers and his income.[5]

Plaintiff Doe purchased a ticket for a round-trip cruise from New York to Bermuda aboard the M/V ZENITH. Doe and five of her friends, all in their early twenties, went on the cruise with four parents. Their group was assigned to a table in the dining area where Aydin waited on them at dinner each night.

On the third morning of the cruise, the M/V ZENITH arrived in Hamilton, Bermuda, a scheduled port-of-call. At dinner, one of Doe's friends asked Aydin "if he knew of any good places to go out on the island because the crew had been

---

[5]Doe claims that cruise lines, such as the defendants', largely hire foreign nationals, such as Aydin, as waiters on their vessels, but that cruise lines do not pay them. Rather, cruise lines set up a table assignment and tipping system and rely on passengers' paying the waiters through that tipping system. Further, the defendants' waiters work on the ship but live elsewhere, and thus passengers (who pay directly defendants' waiters) have little chance of obtaining jurisdiction in American courts over them or of serving process on them even if jurisdiction exists. Aydin is a Turkish national, and as noted earlier, Doe herself was unable to locate Aydin to serve him.

there before." Aydin suggested that they go to the Oasis disco club, which they did.

Aydin's suggestion was not surprising because when the M/V ZENITH was in port at Hamilton, Bermuda, it was customary for the crew and passengers to mingle off the ship at the Oasis. Indeed, the Oasis is a short, five-to-ten-minute walk from the ship, and the ship is clearly visible from the club. While the Oasis closes after 3:00 a.m., Aydin testified that normally crew and passengers stay outside for awhile after closing time. "There are lots of people who sit down around and chat and have fun . . . . This is what usually the people do after the club closes, they stay there and they sit down. They hang out, talk. They chat." The ship's chief security officer testified that "it would be unusual not to see any passenger or crew" on Front Street near the cruise terminal or the front of the Oasis at 3:00 or 4:00 in the morning.

When Doe's group arrived at the Oasis, they found several M/V ZENITH crew members there, including Aydin whom they recognized as their waiter. The six women and three male crew members, including Aydin, "pretty much hung out together . . . basically having a good time, dancing and drinking."

The Oasis closed sometime after 3:00 a.m. Doe's group of women and the three crew members went outside. Two women decided to return to the ship, and

13

Aydin escorted them on the short walk back to the ship. Aydin then returned to the group outside the Oasis and discovered Doe lying on the ground in need of assistance.[6] Aydin offered to help her find a bathroom, and they attempted to go back to the Oasis, but found it closed. They then walked back down Front Street in the direction of the ship.[7]

Doe thought she was going back to the ship and did not feel any concern on the walk "[b]ecause I trusted him. He was a crew member and I know [sic] he was going to take me somewhere to use the bathroom to throw up." Doe further testified that "the only reason [she was] willing to even go for a block and a half or two block walk with [Aydin] was because he worked on the ship."

Aydin and Doe walked past the ship to a small public park. The ship is clearly visible throughout the walk, and one need only take "four or five steps out of the park, stand on Queen Street and the ship [is] right there looking at you." The jury found that in the park Aydin committed sexual battery against Doe, which

_____

[6]The extent of the plaintiff's inebriation and her reason for needing help were contested at trial. Aydin claims that Doe just needed a bathroom, and she appeared "drunk" but "she seemed very happy." Doe claims that she was visibly intoxicated to the point of nausea, was attempting to vomit in the street, could not walk or stand without support and that Aydin said he would "help [her] find a bathroom to throw up." In the light most favorable to Doe, we must consider her as a sick passenger in distress who needed assistance back to the ship.

[7]Doe's best friend and ship roommate had no qualms or reservations about letting Doe walk off with Aydin "[b]ecause . . . he was a crew member. He was there to–he was going to help her." She would not have let her friend walk off with a stranger.

14

the court had charged as sexual penetration without her consent. According to Doe, Aydin pushed her to the ground, bit her lip, and shoved his fingers in her mouth to keep her quiet. Doe cried and indicated repeatedly that she wanted him to stop.

After the sexual encounter, Aydin and Doe walked straight to the ship and split up, with Aydin walking ahead of her on the gangway. Doe went to her room. Doe's friends found her there, distraught, and took her to the infirmary. Doe reported to the nurse "that I went out with some friends, and that I was just raped by one of the crew-members." The ship's doctor administered a rape kit, and Doe filed a report with the ship's security personnel.

After speaking to Bermudian authorities, Doe flew home, along with a friend and that friend's parents, on a flight paid for by defendant Celebrity Cruises. She was examined again at a hospital in Connecticut. All of the medical records were admitted into evidence. Over the following months, she attended numerous counseling sessions for "rape survival" and other issues.

Celebrity Cruises' policy prohibited crew fraternization with passengers while on the ship, but permitted it when passengers and crew left the ship at ports-of-call during the cruise. Aydin testified that, while there was no Celebrity policy that crew members must assist passengers while off the ship and off duty, "[i]f they

15

are my guest, I always have to be polite with them, because I am making my

money from those people, and my ratings, too . . . [I]f it is about the passenger,

then I help them, for if I refuse to help them, then they give me trouble."

It was Aydin's understanding that, while on shore, Celebrity Cruises allowed

him not only to socialize with its passengers, but also to have sex with them.[8]

## III. DISCUSSION

This is a maritime case about a crew member's sexual battery of a passenger.

Before discussing the issues on appeal, we discuss why this case was brought in

district court in Miami, Florida and is within that federal court's admiralty

jurisdiction.

### A.    Jurisdictional Issues

As for why Doe chose a Florida venue, Doe's contract with the defendants

contained a forum selection clause requiring that "all disputes and matters

whatsoever arising under, in connection with or incident to this contract shall be

litigated, if at all, in and before a court located in Miami, Florida, U.S.A."

Although Doe is a Connecticut resident, and the sexual battery occurred on a

round-trip cruise from New York to Bermuda, she had no choice but to sue in

---

[8]Aydin testified that he had the opportunity to have sex with female passengers on many occasions, if he had so desired.  However, in his three years of working on the M/V ZENITH, Aydin had sex with passengers on only three occasions, including the incident in question.

Miami, Florida.

As for jurisdiction, Doe's third amended complaint alleged subject matter jurisdiction based upon both admiralty jurisdiction and diversity of citizenship. Because Doe is a resident of Connecticut and no defendant resides there, diversity jurisdiction clearly exists. See 28 U.S.C. § 1332(a); Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998); Great No. Ry. Co. v. Galbreath Cattle Co., 271 U.S. 99, 102-103, 46 S.Ct. 439, 440 (1926). In the past, this Court applied admiralty law in a diversity case without specifically deciding whether admiralty jurisdiction existed. See Shultz v. Florida Keys Dive Center, Inc., 224 F.3d 1269, 1272 (11th Cir. 2000) (explaining "[t]he question here, however, is not whether subject matter jurisdiction is satisfied, for this case is within the diversity jurisdiction of the federal court, but whether to apply federal admiralty law or state law to a case within the court's jurisdiction"). Furthermore, all parties here continue to assert that the federal maritime law governs Doe's claims against the defendants. Thus, given that diversity jurisdiction exists and the parties' agreement that admiralty law applies, we historically have gone no further.

However, the Supreme Court's recent decision in Norfolk Southern Railway Co. v. Kirby, 125 S. Ct. 385 (2004), suggests that in order for this Court to apply admiralty law, this Court must have admiralty jurisdiction. Id. at 392-93 ("Indeed,

17

for federal common law to apply in these circumstances, this suit <u>must</u> also be sustainable under the admiralty jurisdiction. . . . [T]he grant of admiralty jurisdiction and the power to make admiralty law are mutually dependant . . . .”). Although defendants never challenged the alleged admiralty jurisdiction, we have an independent duty to ensure admiralty jurisdiction exists before applying admiralty law. <u>See</u> <u>Norfolk</u>, 125 S. Ct. at 392-93; <u>See</u> <u>also</u> <u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 93-102, 118 S. Ct. 1003, 1011-16 (1998).

“[A] party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity.” <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 534, 115 S. Ct. 1043, 1048 (1995). Therefore, this Court must determine if two conditions exist: (1) location and (2) connection with maritime activity. We address the connection with maritime activity first.

As the Supreme Court stated in <u>Grubart</u>, “[t]he connection test raises two issues,” which are:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.”

<u>Id.</u> (internal quotation marks and citations omitted).

18

We readily dispense with the first issue of the connection test. As the cruise line industry is maritime commerce, a crew member's sexual assault on a passenger obviously "has a potentially disruptive impact on maritime commerce." It is easy to imagine that if rape or other forms of sexual battery became a concern of passengers, cruise-ship business would necessarily suffer.

As for the second issue of the connection test, the character of the activity here is the interaction between crew members and passengers during an ongoing cruise, which clearly bears a "substantial relationship to traditional maritime activity." Thus, for example, in this case the errant crew member was assigned to serve as the victim's waiter each night while on board the ship, and was permitted to socialize with passengers on shore. In fact, it was customary for crew members and passengers to socialize at the Oasis bar during this particular cruise. The night of the sexual battery, the crew member (at dinner on the ship) directed the victim's group to the Oasis, was there when the victim arrived, and later offered to provide her assistance. The crew member ultimately accompanied Doe back to the ship. Doe then reported her encounter with the crew member to the ship's security personnel and was examined by medical staff aboard the cruise ship. Accordingly, we conclude that the interaction between Doe and the crew member satisfies the connection-with-maritime-activity prong.

We also must consider the location of the tort. Admiralty jurisdiction obviously exists where a crew member sexually batters a passenger while the two are onboard the ship. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628, 79 S. Ct. 406, 408 (1959) ("Kermarec was injured aboard a ship upon navigable waters. It was there that the conduct of which he complained occurred. The legal rights and liabilities arising from that conduct were therefore within the full reach of the admiralty jurisdiction and measurable by the standards of maritime law.") (collecting cases).

Although some temptation exists to draw a bright line between a crew member assault of a passenger that occurs on the ship versus in a port-of-call, "the situation presented here has a more genuinely salty flavor than that." Kossick v. United Fruit Co., 365 U.S. 731, 742, 81 S. Ct. 886, 894 (1961). Furthermore, the Supreme Court recently has taken an expansive view of admiralty jurisdiction and stated that in modern maritime commerce "the shore is now an artificial place to draw a line." Norfolk, 125 S. Ct. at 388.

Although this case may represent the outer boundaries of admiralty jurisdiction over torts, we conclude that admiralty jurisdiction extends to the location of the sexual battery under the peculiar circumstances of this case for several reasons. First, the stop in Bermuda was a scheduled port-of-call, and was

20

an integral part of the on-going cruise or maritime activity in this case. Ports-of-call not only add to the enjoyment of a cruise but form an essential function of the cruise experience. In fact, on this particular cruise, five of the seven nights were to be spent in Bermudian ports. Plainly, individuals choose cruise ship vacations because they want to visit unfamiliar places ashore. Cruises to Alaska, the New England States, Bermuda or the Carribean offer fundamentally different experiences, not generally because of any material difference between ships, but often because of where the ships elect to stop. See Isham v. Pacific Far East Line, Inc., 476 F.2d 835, 837 (9th Cir. 1973) ("Where a passenger or cruise vessel puts into numerous ports in the course of a cruise, these stopovers are the sine qua non of the cruise."). When a passenger selects a particular cruise, ports-of-call or stopovers provide those passengers with the "cruise experience" for which they are paying. Simply put, the destinations or ports-of-call are frequently the main attraction.

Just as ports-of-call serve as an integral part of the maritime cruise, nothing about the particular facts of this case takes the crew member sexual battery outside the scope of this Court's admiralty jurisdiction. The sexual battery occurred very close to the docked ship, and neither the victim passenger nor the crew member left the port-of-call or traveled any real distance from the ship. See generally, Duluth

21

Superior Excursions, Inc. v. Makela, 623 F.2d 1251, 1253 n.5 (8th Cir. 1980) ("Although it might be argued that Makela's injury is remote from the wrongful act, the accident occurred some six minutes after the S.S. Flamingo docked, on a street that adjoins the dock."). As demonstrated by the facts of this case, when docked at the port-of-call, the cruise ship allowed passengers to come and go from the ship as they elected; consequently, there was little practical difference between the port-of-call and other parts of the ship – they were, at all times, equally accessible to passengers. Indeed, the ship literally cast a long shadow; it was close by and visible from the Oasis. It is thus not surprising that passengers and crew members routinely went back and forth between the Oasis and the ship, and routinely socialized together at the Oasis.

Moreover, in many ways this particular incident effectively began and ended aboard the cruise ship. The necessary precursors for this sexual battery occurred while the ship was on navigable waters; that is, it would not have occurred if the ship had not assigned Aydin to be Doe's waiter or if Aydin had not directed Doe's group to attend this particular bar within eyeshot of the ship on that fateful night. And the incident did not end until Aydin and Doe returned to the ship and parted ways.

More importantly, the purpose behind the exercise of this Court's admiralty

22

jurisdiction is to provide for the uniform application of general maritime law. Plainly, the standard of care that governs when a cruise line's crew member assaults a passenger should be uniform and not vary from port to port on a single cruise. Jane Doe was no less a cruise passenger the moment she stepped off the ship at the port-of-call than she was the moment before she stepped off the ship. We see no reason that cruise lines' liability to their passengers while at a regularly-scheduled port-of-call and in a crew member's company should vary from port to port, especially given the potentially disruptive impact on maritime commerce.[9] Indeed, a ruling that admiralty jurisdiction did not extend literally beyond the gangplank in this case would upset the very uniformity that the Supreme Court has determined is so important for maritime activity. See Norfolk, 125 S. Ct. at 388; Grubart, 513 U.S. at 532, 115 S. Ct. at 1047-48.

For these reasons, we conclude that this Court has admiralty jurisdiction over the case. Consequently, we apply federal admiralty law, the law both requested and argued by the parties, to the events that occurred between crew member Aydin and passenger Doe.

---

[9]There is nothing inherently local about the cruise line-passenger relationship in this case that militates against the application of the uniform law of admiralty. In fact, no party has articulated any Bermudian interests at stake in determining the civil liability between Doe and the defendants in this case.

**B.  Rule 50(b) Motion**

As detailed above, at the close of plaintiff's evidence, defendants moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  At the close of all the evidence, defendants renewed certain Rule 50(a) motions.  After the jury's verdict, defendants filed post-judgment motions pursuant to Rule 50(b).  None of the defendants' Rule 50(a) or 50(b) motions, however, raised the evidentiary issue of whether Doe had proved that any one defendant was both a common carrier and Aydin's employer.  Nonetheless, after the defendants' Rule 50(b) motions were filed, the district court sua sponte raised this evidentiary issue.  According to the district court,

> [i]n reviewing the post-verdict motions, the Court became concerned sua sponte with whether Plaintiff had shown the Defendants were common carriers who employed Aydin, thereby properly imposing liability for Aydin's tortious act of sexual battery, as found by the jury.  Although neither party at any time raised this issue, the Court under Fed.R.Civ. P. 50(b) shall consider it.

(emphasis added).  The district court ultimately concluded that "there is no Defendant in this case who is both a common carrier and Aydin's employer for this Court to impose strict liability for the tort the jury found was committed by Aydin against Doe."  On this sole evidentiary ground, the district court granted all defendants judgment as a matter of law under Rule 50(b).

We review de novo the district court's rulings on motions under Rule 50 of

24

the Federal Rules of Civil Procedure, examining the trial evidence in the light most favorable to the non-moving party. Thosteson v. United States, 331 F.3d 1294, 1298 (11th Cir. 2003).

In making its Rule 50(b) rulings, the district court clearly erred because it lacked authority to enter judgment under Rule 50(b) for the defendants on a ground not raised prior to the submission of the case to the jury. Rule 50(b) expressly provides that, after a jury verdict, a party "may renew its request for judgment as a matter of law . . . ." (emphasis added). Fed. R. Civ. P. 50(b). A Rule 50(b) motion is a renewal of a Rule 50(a) motion. See Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1245 (11th Cir. 2001). This Court repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury. See e.g., Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 717 n.3 (11th Cir. 2002); Middlebrooks, 256 F.3d at 1245 (11th Cir. 2001).[10]

---

[10]Rule 50(b) provides:
(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment -- and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

25

As this Court stated in Middlebrooks, a Rule 50(a) motion for judgment as a matter of law "can be renewed after trial under Rule 50(b), but a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion." Middlebrooks, 256 F.3d at 1245 (citation omitted). This rule ensures "that opposing counsel will not be 'ambushed' or 'sandbagged' regarding the sufficiency of the evidence adduced at a point in the trial proceedings when it is too late to address possible insufficiencies. The purpose of Rule 50(b) . . . [is] 'to avoid making a trap' out of a motion for JNOV." Crawford v. Andrew Sys., Inc., 39 F.3d 1151, 1153-54 (11th Cir. 1994) (quoting Sims' Crane Serv. v. Ideal Steel Prod., Inc., 800 F.2d 1553, 1557 (11th Cir. 1986)).

Given the purpose and renewal nature of a Rule 50(b) motion, this Court also has instructed that a district court does not have the authority under Rule 50(b) to rule sua sponte on issues not raised by the parties. Crawford, 39 F.3d at 1154 ("Just as we would not permit defendants who had made no previous motion to ask the court to rule on the legal sufficiency of the evidence once a verdict had been

---

    (1) if a verdict was returned:
        (A) allow the judgment to stand,
        (B) order a new trial, or
        (C) direct entry of judgment as a matter of law; or
    (2) if no verdict was returned;
        (A) order a new trial, or
        (B) direct entry of judgment as a matter of law.
Fed. R. Civ. P. 50(b).

returned against them, we cannot permit the district court to so rule <u>sua sponte</u>.").[11]

In this case, after the jury rendered its verdict, the district court <u>sua sponte</u> became concerned with an evidentiary issue – whether any one defendant was both a common carrier and Aydin's employer – not raised by the parties prior to submission of the case to the jury. We recognize that the district court did request and allow further, post-judgment briefing on the issue. Nonetheless, the district court ultimately granted judgment as a matter of law based upon a lack of evidence regarding a factual issue never raised by any defendant before the trial, and never addressed by anyone in any way before submission of the case to the jury. This is precisely the type of post-verdict "trap" that Rule 50(b) is designed to avoid.

Accordingly, we conclude that the district court lacked authority to grant a

---

[11]This rule is consistent with those of our sister circuits. <u>See</u> <u>American and Foreign Ins. Co. v. Bolt</u>, 106 F.3d 155, 160 (6th Cir. 1997) ("The opinion below explicitly states that the Magistrate found the <u>Garden City</u> decision himself and <u>sua sponte</u> relied on it as a basis for granting JNOV. This action is in contravention of the dictates of Fed. R. Civ. P. 50(b) and for that reason must be reversed."); <u>Murphy v. City of Long Beach</u>, 914 F.2d 183, 185-86 (9th Cir. 1990) (concluding that "[f]or the same reasons a party may not seek a JNOV on grounds not alleged in their motion for directed verdict, a district court may not enter a JNOV on grounds not asserted in a party's motion for directed verdict"); <u>Kutner Buick, Inc. v. American Motors Corp.</u>, 868 F.2d 614, 617 (3rd Cir. 1989) (reversing district court's decision to grant JNOV where that decision was based on grounds other than those advanced in the party's motion); <u>Mozingo v. Correct Mfg. Corp.</u>, 752 F.2d 168, 171-72 (5th Cir. 1985) (reversing a district court's decision granting JNOV on a ground not advanced by the party's motion as an abuse of the court's discretion and a violation of the precepts of Rule 50(b)). As an example of how Rule 50(b) should be applied, the Advisory Committee's Notes on Rule 50(b) reference the Third Circuit's <u>Kutner Buick</u> decision. <u>See</u> Fed. R. Civ. P. 50(b) advisory committee's note.

27

Rule 50(b) judgment on a ground not raised by the parties prior to the submission of the case to the jury. We therefore vacate the district court's Rule 50(b) judgment as a matter of law in favor of the defendants and reinstate the jury's verdict in favor of the plaintiff Doe.

While this Rule 50(b) issue is easily resolved by our precedent, the next issue is not. The defendants' cross-appeal raises the important issue of whether a cruise line, as a common carrier, is strictly liable for crew member assaults on its passengers during transit. Accordingly, we must navigate through considerable precedent about the duty of common carriers to protect and safely transport their passengers and common carriers' corresponding liability for crew member assaults.

## C. Liability for Crew Member Assaults

### 1. Supreme Court

As to the issue of common carriers' special duty to their passengers, there are only three Supreme Court decisions that bear on the issue. New Jersey Steam-Boat Co. v. Brockett, 121 U.S. 637, 7 S. Ct. 1039 (1887); New Orleans & N.E.R. Co. v. Jopes, 142 U.S. 18, 12 S. Ct. 109 (1891); Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S. Ct. 406 (1959). The parties cite these same cases but disagree about their import. We thus begin by analyzing these three decisions.

In 1887, the United States Supreme Court first addressed crew member assaults against ship passengers. In Brockett, the passenger was improperly "abaft the shaft," an area of the ship forbidden to "deck passengers." 121 U.S. at 1040, 7 S. Ct. at 644. A crew member violently removed the passenger from the forbidden area, dislocated his shoulder, and used unnecessary and excessive force. 121 U.S. at 1042, 75 S. Ct. at 647. The Supreme Court upheld the jury's verdict compensating the passenger for his injuries. The Supreme Court concluded that, despite the passenger's presence in a forbidden area, if the passenger's injuries "were directly caused by the improper conduct of the carrier's servants, either while acting within the scope of their general employment, or when in the discharge of special duties imposed upon them, [the passenger] is not precluded from claiming the benefit of the contract for safe transportation." Brockett, 121 U.S. at 645, 7 S. Ct. at 1041. Rather, the passenger was entitled "to protection against the misconduct or negligence of the carrier's servants." Id.

In Brockett, the Supreme Court further stated that the "misconduct or negligence" of the carrier's servants "while transacting the company's business, and when acting within the general scope of their employment, is of necessity to be imputed to the corporation." Id. "[I]t makes no difference that the master did not authorize or even know of the servant's act or neglect, or even if he disapproved or

29

forbade it, he is equally liable if the act be done in the course of his servant's employment." Id. (quotation marks and citation omitted).

This principle, according to the Supreme Court in Brockett, is "peculiarly applicable as between carriers and passengers; for . . . a common carrier is bound, as far as practicable, to protect its passengers, while being conveyed, from violence committed by strangers and co-passengers, and undertakes absolutely to protect them against the misconduct of its own servants engaged in executing the contract." Id. at 645-46, 7 S. Ct. at 1041 (citation omitted) (emphasis added).

In reaching these conclusions in a ship case, the Supreme Court in Brockett relied exclusively upon prior decisions involving trains, and in effect, treated a ship as a common carrier similar to a train.[12]  As shown here and later in this opinion, the federal maritime law essentially relies upon, and incorporates, the federal common law governing a common carrier's liability as its liability standard for crew member assaults on passengers.

Given Brockett's reference to a duty of absolute protection against crew member misconduct, some courts subsequently read Brockett as not allowing a

_____

[12]In this case, the parties do not dispute that a cruise ship is considered a common carrier under federal maritime law.  See Shultz v. Florida Keys Dive Center, 224 F.3d 1269, 1273 (11th Cir. 2000) (describing cruise ships as common carriers); Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1334 (11th Cir. 1984) (same).  Rather, they dispute the standard of care owed by ship defendants, as common carriers, to their passengers.

ship-employer to defend an assault claim on the basis that the crew member was acting outside the scope of his employment.  See, e.g. Pacific S.S. Co. v. Sutton, 7 F.2d 579, 580 (9th Cir. 1925) (citing Brockett for proposition that "scope of employment" is not required); Forrester v. Southern Pac. Co., 134 P. 753, 774-75 (Nev. 1913) (same).  In fact, Brockett is ambiguous on this issue because it contains conflicting formulations and leaves open to interpretation whether the wrongful act at issue necessarily must be within the "scope of the employment," or merely in the "course of employment."

In any event, a few years later the Supreme Court applied and clarified Brockett in another common carrier case, New Orleans & N.E.R. Co. v. Jopes, 142 U.S. 18, 12 S. Ct. 109 (1891).  Jopes involved a conductor's shooting of a train passenger.  The Supreme Court in Jopes appears to have removed any scope-of-employment requirement and concluded that a common carrier is absolutely liable for unlawful assaults by its employees against its passengers.  In Jopes, the Supreme Court quoted Brockett's rule that "a common carrier undertakes absolutely to protect its passengers against the misconduct or negligence of its own servants, employed in executing the contract of transportation, and acting within the general scope of their employment."  142 U.S. at 25, 12 S. Ct. at 111 (quoting Brockett, 122 U.S. at 637, 7 S. Ct. At 1039).  But after discussing Brockett, the

31

Supreme Court in <u>Jopes</u> noted that "courts hold that the liability of a common

carrier to his passengers for the assaults of his employees is of a most stringent

character, far greater than that of ordinary employers for the actions of their

employes [sic]." <u>Jopes</u>, 142 U.S. at 26, 12 S. Ct. at 112.  In <u>Jopes</u>, the Supreme

Court then cited a legal treatise for the proposition that a common carrier is "bound

<u>absolutely</u> to see to it that no unlawful assault or injury is inflicted upon

[passengers] by their own servants." <u>Id.</u> (citation omitted).

More importantly, in <u>Jopes</u>, the Supreme Court further explained that the

defense most often raised by an employer in a case involving an employee's

assault upon a passenger was that the employee's act "was a wanton and willful act

on his part, outside the scope of his employment, and therefore something for

which his employer was not responsible." <u>Id.</u>, 142 U.S. at 27, 12 S. Ct. at 112.

The Supreme Court acknowledged that "if the act was of that character, the general

rule is that the employee alone, and not the employer, is responsible." <u>Id.</u>

However, the Supreme Court in <u>Jopes</u> continued, "<u>[b]ut owing to the peculiar</u>

<u>circumstances which surround the carrying of passengers, as stated, a more</u>

<u>stringent rule of liability has been cast upon the employer; and he has been held</u>

<u>liable although the assault was wanton and willful, and outside the scope of the</u>

32

employment." Id. (emphasis added).[13]

The Supreme Court in Jopes further stated that this liability rule is extremely broad and encompasses unlawful acts plainly not done "in furtherance of the carrier's business" as follows:

> Recent cases state this liability in the broadest and strongest language; and, without going beyond the actual decisions, it may be said that the carrier is liable for every conceivable wrongful act done to a passenger by its train hands and other employees while they are engaged in transporting him, no matter how willful and malicious the act may be, or how plainly it may be apparent from its nature that it could not have been done in furtherance of the carrier's business.

Id., 142 U.S. at 26, 12 S. Ct. at 112 (citation and quotation marks omitted).

In both Brockett and Jopes, the Supreme Court spoke of common carrier liability in general, and was unconcerned with whether the specific mode of transport was a ship or a train.[14] As noted earlier, Brockett, a ship case, cited and

---

[13]This strict liability of a common carrier for employee assaults on passengers is premised historically in part upon the entrustment of passengers' personal safety to the common carrier. Craker v. Chicago & Northwestern Ry. Co., 36 Wis. 657, 671 (1875) ("passengers of necessity commit to [the officers of a common carrier] their safety and comfort in transitu"); Goodard v. Grand Trunk Ry. of Canada, 57 Me. 202, 213-14 (1869) (noting of common carriers that "[t]o their care and fidelity are intrusted the lives and limbs and comfort and convenience of the whole traveling public, and it is certainly as important that these servants should be trustworthy as it is that they be competent" and further that "[t]he carrier's obligation is to carry his passengers safely and properly, and to treat him respectfully, and if he intrusts the performance of this duty to his servants, the law holds him responsible for the manner in which they execute the trust.").

[14]See discussion on this point in Philip H. Budwick, "Strict Liability or Negligence: What Standard of Care Applies When Crewmembers Assault Passengers on Cruise Ships?" 19 Tul. Mar. L.J. 353, 358 (1995) ("Because the Brockett Court cited several railroad cases for authority and the Jopes Court cited Brockett, it is reasonable to suggest that the rule in Jopes also applies

discussed train cases.  In turn, <u>Jopes</u>, a train case, cited and discussed <u>Brockett</u>.[15]

After noting in <u>Jopes</u> that a common carrier is liable for its employee's assault on a passenger outside the scope of his employment, the Supreme Court then dealt with the narrow issue of whether an employee's conduct must be unlawful before it triggers this stringent liability imposed on the common carrier employer.  The Supreme Court concluded that if the conductor-employee's shooting the passenger was in self-defense and therefore lawful, the employee was not liable and in turn the common-carrier employer was not liable.  <u>Id.</u>, 142 U.S. at 27, 12 S. Ct. at 112.[16]

_____

to passenger ships because both are considered common carriers.").

[15]The Supreme Court continues to shape its federal maritime law from its decisions about common carriage involving trains.  <u>See</u> <u>Norfolk Southern R. Co. v. Kirby</u>, 125 S. Ct. 385, 389 (2004) (deriving rule in maritime case from railroad common carrier case) (citing <u>Great Northern R. Co. v. O'Connor</u>, 232 U.S. 508, 34 S. Ct. 380 (1914)).

[16]After <u>Jopes</u>, numerous courts in both ship cases and train cases have concluded that a common carrier is strictly liable for assaults by its employees against passengers.  <u>See, e.g</u> <u>Matthews v. Southern Ry. Sys.</u>, 157 F.2d 609, 610-11 (D.C. Cir. 1946) (stating that a "common carrier is required to protect its passengers against assault or interference with the peaceful completion of their journey."); <u>Pullman Co. v. Hall</u>, 46 F.2d 399, 404 (4th Cir. 1931) (noting exception to general liability rule and holding common carrier liable to passenger for a servant's assault);  <u>Pacific S.S. Co. v. Sutton</u>, 7 F.2d 579, 580 (9th Cir. 1925) (steam ship company has duty "to carry safely and to protect its passenger from violence and insult committed by its own servants.");  <u>Kansas City S. Ry. Co. v. Willsie</u>, 224 F. 908, 910 (8th Cir. 1915) (discussing "the absolute nature of the carrier's duty to protect the passenger from the assaults and insults of its own servants during the transit");  <u>Marks v. Alaska S.S. Co.</u>, 127 P. 1101, 1101 (Wash. 1912) (ship owner owed to passenger "a duty of absolute protection from the assaults and aggressions of it servants, and the rule is well-nigh universal that the carrier cannot plead as a defense that the servant acted outside the scope of his employment.");  <u>see also</u> <u>The Minnetonka</u>, 146 F. 509, 513 (2nd Cir. 1906) (noting, where a crew member stole a ship passenger's jewelry, that the liability of the vessel for the willful torts of its crew is "well established.").

34

It is noteworthy that Jopes relied upon the carrier-passenger relationship and the "peculiar circumstances which surround the carrying of passengers." Id. A common carrier's strict liability to a passenger for crew member assaults during transit rests upon its special implied duty of protection and safe transport that it owes as a common carrier through its employees to its passengers, and not for the reason that the act is incident to a duty within the scope of the crew member's employment. See, e.g. Kansas City S. Ry. Co. v. Willsie, 224 F. 908, 911 (8th Cir. 1915) (acknowledging "the absolute nature" of the carrier's duty to protect passengers from assaults by its employees and stating that "[t]he carrier is liable in such cases because the act is violative of the duty and a breach of the obligation it owes through the servant to the passenger, and not upon the idea that the act is incident to a duty within the scope of the servant's employment"). In other words, the rationale for imposing strict liability on the common carrier employer is the carrier-passenger relationship and the corresponding existence of an implied duty of protection and safe transport free from assault by the carrier's employees during transit. In terms of tort liability, this becomes, in effect, a special non-delegable duty owed by the carrier to the passenger.[17]

---

[17]Defendants argue that the district court's dismissal of Doe's breach-of-contract claims makes it impossible for her to recover. While it is the contract for safe transportation that creates an implied duty on the part of the common carrier to protect and safely transport its passengers, the "breach of the carrier's duty is a maritime tort." Kornberg, 741 F.2d at 1334 (11th Cir. 1984)

35

As plaintiff points out, a comment to the Restatement (Second) of Agency

explains how a duty to protect may be imposed by law by virtue of and as incident

to the carrier-passenger relationship, as follows:

> A master or other principal may be in such relations to another that he has a duty to protect, or to see that due care is used to protect, such other from harm although not caused by an enterprise which has been initiated by the master or by things owned or possessed by him. This duty may be created by contract, as where one agrees to protect another, or may be imposed by law as incident to a relation voluntarily entered into, as the relation of carrier and passenger, or by statute . . . . [T]he fact that the one to whom the performance of the duty is delegated acts for his own purposes and with no intent to benefit the principal or master is immaterial.

Restatement (Second) of Agency § 214 cmt. e (1958) (emphasis added).[18]

Further, we reject the defendants' claim that the Supreme Court abandoned

the Jopes rule in Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625,

79 S. Ct. 406 (1959). In Kermarec, the plaintiff was not a passenger, but was

visiting a crew member. While on board the ship, the plaintiff fell on a staircase

allegedly due to the improper way a runner was attached to the stairs. The plaintiff

_____

(citation and quotation marks omitted); see also Nadeau v. Costley, 634 So. 2d 649, 653 (Fla. Dist. Ct. App. 1994) (concluding that the breach of a cruise line's duty to protect its passengers due to a crew-member assault is actionable "in tort (strict vicarious liability) or contract (breach of contract of carriage based on an intentional assault)").

[18]In this same comment to the Restatement (Second) of Agency, the American Law Institute also provided the following illustration: "P, a railroad, employs A, a qualified conductor, to take charge of a train. A assaults T, a passenger. P is subject to liability to T." Restatement (Second) of Agency § 214 cmt. e, illus. 3 (1958).

sued for personal injury due to the ship owner's negligence. Id. at 626-27, 79 S. Ct. at 407-08. The district court in Kermarec concluded that the ship owed a lower standard of care to the plaintiff as a "gratuitous licensee" under the laws of New York. Id. at 629, 79 S. Ct. at 409.

The Supreme Court in Kermarec decided that admiralty law need not import the land-based common law distinctions between "invitees" and "licensees," Id. at 631, 79 S. Ct. at 410, and concluded "that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." Id. at 632, 79 S. Ct. at 410. In analyzing the ship's liability to the visitor, the Supreme Court in Kermarec also stated that, "[i]t is a settled principle of maritime law that a shipowner owes a duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Id. at 630, 79 S. Ct. at 409.

While this reasonable care language in Kermarec is broad, the Supreme Court was answering only a narrow question of law regarding whether the distinction between "licensees" and "invitees" imposed a lower standard of care on ship owners in a slip-and-fall case.

More importantly, Kermarec did not involve an assault or any intentional tort committed by a crew member on a passenger. Rather, Kermarec was a

common, garden variety negligence case no matter how it is characterized. Indeed, Kermarec addressed the standard of care owed by common carriers in a situation where a person sustained personal injuries due to the physical condition of the ship. Further, Kermarec did not cite or discuss Brockett or Jopes. Quite simply, there is no indication in Kermarec that the Supreme Court intended to eliminate the more stringent rule in Jopes imposing liability on a common carrier for its employees' assaults of passengers.[19]

---

[19]Earlier we noted that Section 214 of the Restatement (Second) of Agency supports our conclusion regarding common carrier liability for crew member assaults. Likewise, the tentative draft of the Restatement (Third) of Agency, in the corresponding section states: "A principal required by law to protect another cannot avoid liability by delegating performance of the duty to another, whether or not the delegate is an agent." Restatement (Third) of Agency § 7.06 (Tentative Draft No. 5, 2004). The relevant comment notes that the section "states the basic tort-law principle that a principal may be subject to liability to a third person when the principal is under a duty to protect that person. The principle is often termed one of "nondelegable" duty . . ." Id. § 7.06, cmt. a. Further, the Reporter's Notes under this section specifically apply the same rule as we do to ship owners' liability for their crew's misconduct against passengers:

> In admiralty cases, it was long assumed that a ship owner was subject to liability for its employees' misconduct against passengers. See New Jersey Steamboat Co. v. Brockett, 121 U.S. 637 (1887) (ship owner liable when employee forcibly removed passenger from area of ship); New Orleans & N.E.R.R. Co. v. Jopes, 142 U.S. 18 (1891) (extending owner's strict liability under Brockett to circumstances in which employee acted outside scope of employment, as by shooting passenger). In Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959), the Court held that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances." Kermarec did not overrule Brockett or Jopes, however, and involves not an employee's tort against a passenger but a passenger's fall down a defectively-constructed staircase.

Id., note b.

38

Although we agree with the defendants that the age of the <u>Brockett</u> and <u>Jopes</u> decisions and the intervening decision in <u>Kermarec</u> suggest that the Supreme Court might well reconsider its former rulings were an opportunity to arise, the defendants fail to persuade us that <u>Kermarec</u> overruled <u>Brockett</u> and <u>Jopes</u>, either explicitly or implicitly. Instead, we agree with Doe that <u>Brockett</u> and <u>Jopes</u> represent the current state of the controlling federal law as to crew member assaults on passengers.[20] Our precedent, as well as the decisions of other circuits, support this conclusion.

## 2. Eleventh Circuit

While we can locate no post-<u>Kermarec</u> decision in our Circuit involving a crew member assault on a passenger, there is a slip-and-fall decision that mentions in dicta "the unconditional responsibility" a common carrier has for its employees' misconduct. <u>Tullis v. Fid. & Cas. Co. of New York</u>, 397 F.2d 22, 23 (5th Cir.

---

[20]Interestingly, our reading of the rules enunciated in <u>Brockett</u> and <u>Jopes</u> is consistent with the current congressional direction on the issue before us. In 1996, Congress amended 46 U.S.C. App. § 183c, which forbids a vessel owner or operator from contractually limiting negligence liability, to include a section allowing the vessel to limit its liability for the infliction of emotional distress. Pub.L. 104-324, § 1129(b). However, Congress specifically provided that such contractual limitations on liability could not limit liability for distress "intentionally inflicted by a crewmember or the manager, agent, master, owner or operator." 46 U.S.C. App. § 183c(b)(1)(C). The statute further provides that "[n]othing in this subsection is intended to limit the liability of a crewmember or the manager, agent, master, owner, or operator of a vessel in a case involving sexual harassment, sexual assault, or rape." 46 U.S.C. App. § 183c(b)(2).

1968).[21]  In Tullis, this Court concluded that negligence was the applicable liability standard for the slip-and-fall in that case and cited Kermarec.  This Court in Tullis, however, also noted that in an admiralty action involving liability to ship passengers, "[t]he liability basis is negligence with the only apparent exception being the unconditional responsibility of the carrier for the misconduct of the crew toward the passengers."  Id. at 23.

Our other slip-and-fall cases apply the Kermarec standard of reasonable care under the circumstances.  Everett v. Carnival Cruise Lines, 912 F.2d 1355 (11th Cir. 1990) (passenger tripped over metal threshold cover in a doorway);  Keefe v. Bahama Cruise Lines, Inc., 867 F.2d 1318 (11th Cir. 1989) (passenger slipped and fell in a cruise ship disco).  A fourth decision also involves defects in the ship's physical condition and adopts Kermarec's negligence standard.  Kornberg, 741 F.2d at 1334 (11th Cir. 1984) (in case involving failure of cruise ship's sanitary system, court stated "[a] carrier by sea . . . is not liable to passengers as an insurer, but only for its negligence.") (citing Kermarec).[22]  None of these four physical-

_____

[21]In the case of  Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[22]Defendants' reliance on Gibboney v. Wright, 517 F.2d 1054 (5th Cir. 1975), is misplaced.  There, the defendant was the private owner of a pleasure craft, not a common carrier for hire, and the plaintiffs were injured by an improperly secured fuel tank and not by an assault.  At best, Gibboney stands for the proposition acknowledged above that our Circuit applies a reasonable care standard in cases involving alleged defects in a vessel's physical condition.

40

condition cases cites Jopes or Brockett, and none involves a crew member assault on a passenger.

In sum, while our precedent applies Kermarec's negligence standard in slip-and-fall and other physical condition cases as did Kermarec itself, our decision in Tullis acknowledged the "unconditional responsibility" exception for crew member misconduct toward a passenger.[23] Our precedent thus does not, and indeed could not, alter Jopes' strict liability rule for such assaults.

### 3. Other Circuits

Only the Ninth Circuit has squarely answered the question of whether, post-Kermarec, a cruise line, as a common carrier, remains strictly liable for crew member assaults on passengers. Morton v. De Oliveira, 984 F.2d 289 (9th Cir. 1993). As explained below, the Ninth Circuit concluded that Kermarec did not overturn the general maritime rule that a ship, like other common carriers, is absolutely liable for crew member assaults on its passengers during transit. Id. at

---

[23]The district court in this case and another district court in Florida both concluded that Kermarec did not overturn the rule in Brockett and Jopes that a common carrier is vicariously liable for crew member assaults on passengers. See Doe v. Celebrity Cruises, 145 F.Supp. 2d 1337, 1342 (S.D. Fla. 2001) (concluding that the Eleventh Circuit would adopt the "majority view" that Kermarec did not change the strict or vicarious liability rule for crew member assaults and stating that "[t]his majority view makes the most sense because it limits Kermarec to its facts, while implicitly recognizing that Supreme Court cases such as Brockett and Jopes have not been overruled."); Stires v. Carnival Corp., 243 F.Supp. 2d 1313, 1318 (M.D. Fla. 2002) ("Kermarec is distinguishable on its facts and absent binding Eleventh Circuit precedent, the majority rule is that a common carrier, such as a cruise line, is vicariously liable for the intentional torts of its employees.") (citing Doe, 145 F. Supp. at 1341-45).

41

292.

In Morton, the plaintiff was alone in her cabin when a crew member delivered wine and raped her.[24] The plaintiff sued, asserting "absolute liability" on the part of the cruise line for crew member assaults on passengers. Id. at 290. The plaintiff conceded that she was "unable to show any negligence by [the defendant cruise line] in hiring or supervising" its crew member. Id. The district court determined that the strict liability standard for assaults was "superseded or over-ruled by Kermarec." Id.

Reversing, the Ninth Circuit determined that "Kermarec cannot be read to overrule" the maritime tort principle that a common carrier owes a duty to protect passengers from assaults by its crew members and is absolutely liable for such assaults. Id. at 292. The Ninth Circuit noted that this absolute liability rule "for crew member assaults cannot be traced to obsolete concepts," but that "it is a widely adopted rule that common carriers owe such an absolute duty to their passengers." Id. at 291-92 (citing St. Michelle v. Catania, 250 A.2d 874, 876-78 (Md. 1969) (carrier vicariously liable for assaults committed by employees even outside their employment during the contract for transportation); Whittle v.

---

[24]In Morton, as in this case, the main factual dispute was over consent. The defendants claimed that the crew member was delivering milk and the passenger invited him in for wine and seduced him. The passenger alleged that the crew member appeared at her door with a bottle of wine, said he thought she would like to sample some, and raped her. 984 F.2d at 290.

Southern Bell Tel. & Tel. Co., 410 S.E.2d 575, 575 (S.C. Ct. App. 1991) (same);

Nazareth v. Herndon Ambulance Serv., Inc., 467 So. 2d 1076, 1078 (Fla. Dist. Ct.

App.) (same), review denied 478 So. 2d 53 (Fla. 1985)).

The Ninth Circuit in Morton also relied upon this observation, by a leading

torts treatise, explaining the non-delegable duty of protective care:

> Where the deliberate or willful wrong was not done to further the
> master's business the tendency has been to deny vicarious liability, but
> here too there have been many qualifications. The relationship
> between master and plaintiff may be such as to put on the master a
> duty of protective care that he may not delegate. Thus a carrier is
> liable to its passengers for assaults by employees prompted by purely
> personal motives.  5 Fowler V. Harper, Fleming James, Jr., & Oscar S.
> Gray, The Law of Torts § 26.9, at 53 (2d ed. 1986).

Morton, 984 F.2d at 292 (emphasis added).[25]

The defendants argue that a circuit split is created by the First Circuit's

decision in Muratore v. M/S Scotia Prince, 845 F.2d 347 (1st Cir. 1988), and the

Second Circuit's decision in Compagnie Generale Transatlantique v. Rivers, 211 F.

294 (2nd Cir. 1914).  We disagree and explain why.[26]

---

[25]In reaching its conclusions, the Ninth Circuit in Morton also relied heavily upon its own 1925 decision in Pacific S.S. Co. v. Sutton, 7 F.2d 579 (9th Cir. 1925).  Morton, 984 F.2d at 290-91.  In Sutton, two crewmen sexually assaulted a female passenger.  The Ninth Circuit concluded that the defendant ship as a common carrier owed to plaintiff "a duty of absolute protection from the assaults and aggressions of its servants" and stated that "the rule is well nigh universal that the carrier cannot plead as a defense that the servant acted outside the scope of his employment." Sutton, 7 F.2d at 580 (internal quotations and citations omitted).

[26]The defendants also rely upon two Fifth Circuit decisions, Jackson Marine Corp. v. Blue Fox, 845 F.2d 1307 (5th Cir. 1988), and Smith v. S. Gulf Marine Co. No. 2, Inc., 791 F.2d

43

In Muratore, the First Circuit is equivocal, but appears to have followed the absolute liability rule. There, crew photographers harassed the plaintiff passenger, disregarded her request not to be photographed, and repeatedly took her picture. Muratore, 845 F.2d at 349-50. The First Circuit rejected the defendant ship's contention that "even if the photographers' conduct constitutes intentional infliction of emotional distress, defendant cannot be held legally responsible for the photographers' conduct." Id. at 353. Affirming the ship's vicarious liability, the First Circuit concluded, "a maritime carrier has an unconditional responsibility for the misconduct of its people toward the passengers." Id. (emphasis added) (internal quotations and citation omitted).[27]

---

416 (5th Cir. 1986). Neither decision, however, involves a crew member assault on a passenger, and both are otherwise quite different from this case. Indeed, Smith dealt with a slip-and-fall aboard a vessel chartered specially to transport workers to their work site. Although applying the Kermarec "reasonableness" standard in Smith, the Fifth Circuit reversed judgment for the defendant ship-owner, and held it liable to plaintiff as a matter of law. Smith, 791 F.2d at 421.

Jackson Marine is even more inapposite as it involved fraud by a salvage boat captain against the owner of a damaged ship, and in no way involved a common carrier or a passenger. In Jackson Marine, the Fifth Circuit concluded that the ship owner was vicariously liable for the captain's torts, albeit with the requirement that they be committed "within the scope of the captains normal duties and employment." 845 F.2d at 1310. Neither Smith nor Jackson Marine assist us in determining a cruise line's liability for crew member assaults on passengers.

[27]Despite this clear statement in the liability section, the First Circuit's Muratore decision contains a separate section entitled "IV. COMPENSATORY DAMAGES." In that damages section, the First Circuit discussed the defendant's concern "that the lower court made repeated reference of the carrier's higher degree of care." Id. The First Circuit then cited Kermarec and stated that, "it is axiomatic in maritime law that a carrier owes a duty of exercising reasonable care towards its passengers under the circumstances." Id. Later, the First Circuit cited Kermarec again and stated that the duty of exercising reasonable care under the circumstances is "the appropriate legal standard." Id. at 354. The First Circuit concluded that the district court's use of the language "special duty" in its jury charge was not prejudicial to the defendant and

44

We also agree with Doe that the Second Circuit in <u>Rivers</u> did not necessarily adopt a negligence/scope-of-employment rule for crew member assaults on passengers. In <u>Rivers</u>, a crew member hid in the plaintiff's cabin, waited for her return, and attacked her. After a verdict for the plaintiff, the defendant appealed, claiming error because the district court had charged the jury "that the defendant was bound to an obligation 'of the very highest degree of care to protect its passengers.'" 211 F. at 298. The district court, however, had also instructed the jury that the defendant was not an absolute insurer against assaults and that a passenger could not recover unless there was some negligence by the carrier. <u>Id.</u> The district court also "pointed out the difference between an assault by an employee when carrying out the orders of his employer and a wanton one, committed when off duty." <u>Id.</u>

In affirming the verdict for the plaintiff, the Second Circuit in <u>Rivers</u> cited <u>Jopes</u> and <u>The Minnetonka</u>, and remarked that the district court had "instructed <u>more favorably</u> to defendant than some of the authorities indicate." <u>Rivers</u>, 211 F. at 298 (emphasis added). <u>The Minnetonka</u>, like <u>Jopes</u>, imposed a strict liability

affirmed the award of compensatory damages. <u>Id.</u> In the end, the First Circuit's <u>Muratore</u> decision at worst points in both directions: unconditional responsibility and reasonable care under the circumstances. We also note that a district court in Maine recently concluded that under <u>Muratore</u> a cruise line is unconditionally liable for a crew member's sexual assault of a passenger. <u>Peterson v. Scotia Prince Cruises, Ltd.</u>, 328 F. Supp. 2d 119, 122 (D. Me. 2004).

45

rule. Indeed, the Second Circuit in <u>The Minnetonka</u> stated that "[t]he archaic doctrine that the moment a servant of a carrier commits a wanton assault upon a passenger he acts outside the scope of his authority and thus releases his employer from liability was long ago renounced by the great preponderance of authority." 146 F. at 513.[28] Given <u>Rivers</u>'s reliance on <u>Jopes</u> and <u>The Minnetonka</u> for stating that the jury charge was more favorable to the defendant than indicated, we do not read <u>Rivers</u> as necessarily establishing a negligence/scope-of-employment standard for crew member assaults on passengers.[29] At worst, the import of <u>Rivers</u> is unclear.[30]

Having canvassed the relevant Supreme Court and circuit precedent, we now turn to the liability issues on appeal in this case.

---

[28]In <u>The Minnetonka</u>, the Second Circuit affirmed the verdict for the passenger against the steamship carrier for the value of jewelry stolen by a steward who came into the stateroom, reached over the passenger in her berth and seized the jewelry bag. 146 F. at 512-13.

[29]Post-<u>Kermarec</u> decisions in the Second Circuit, as in this Circuit, adopt a reasonable care standard for slip-and-fall lawsuits by passengers where no crew member assault is involved. <u>See e.g.</u>, <u>Monteleone v. Bahama Cruise Line, Inc.</u>, 838 F.2d 63 (2nd Cir. 1988) (plaintiff fell down a flight of stairs); <u>Rainey v. Paquet Cruises, Inc.</u>, 709 F.2d 169 (2nd Cir. 1983) (plaintiff tripped over a stool in ship disco).

[30]We read <u>Rivers</u> as affirming the verdict for the plaintiff primarily because, although the district court had improperly permitted the jury to apply a less stringent standard of care (i.e. negligence), the evidence at trial demonstrated the ship owner was still liable to the passenger even under the lower "negligence" standard of care. However, the district courts in New York have read <u>Rivers</u> as establishing a negligence standard. <u>York v. Commodore Cruise Line, Ltd.</u>, 863 F.Supp. 159, 162 (S.D.N.Y. 1994); <u>Jaffess v. Home Lines, Inc.</u>, 1988 WL 42049, at *5 (S.D.N.Y. April 22, 1988).

46

### 4. Legal Standard Governing Doe's Claims

The principal liability issue is which standard governs the defendants' liability to its passenger Doe for crew member assaults: (1) strict liability or (2) reasonable care under the circumstances.

For the reasons we have detailed at some length, we conclude that the defendants owe a non-delegable duty to protect their passengers from crew member assaults and thereby safely transport their cruise passengers, that the Supreme Court's decisions in Brockett and Jopes remain binding precedent, that Kermarec did not overrule Brockett or Jopes, and thus that the district court did not err in concluding that the defendants are strictly liable for crew member assaults on their passengers during the cruise. We add that Kermarec's reasonable care standard does not apply to a crew member's sexual assault on a passenger. Tullis, 397 F.2d at 23.

We turn, then, to the defendants' alternative argument that even if the strict liability standard governs crew member assaults on passengers during a cruise, that standard cannot apply factually to this particular case because (1) the sexual battery occurred while Aydin was off duty and off the ship and (2) the special carrier-passenger relationship was severed when Doe and Aydin left the ship's premises.

### 5. Carrier-Passenger Relationship Between Doe and Aydin

47

The case precedent establishes that, due to the special carrier-passenger relationship, the defendants had a non-delegable duty to protect and safely transport Doe during the cruise, and thus are liable if a crew member assaulted her during the cruise. There is no dispute that this carrier-passenger relationship has a temporal limit based on the duration of the cruise. This sexual battery occurred on July 19, 1999, and undisputedly fell within the seven-day time period of the cruise from July 17 to July 24, 1999.

The next issue is whether the common carrier-passenger relationship has a strict spatial limit so that the common carrier-passenger relationship was severed when Doe and Aydin left the ship's premises. For the reasons outlined in the jurisdiction section above, we conclude that the carrier-passenger relationship continued between the defendants and Doe during her interaction with Aydin in this scheduled port-of-call.

In this regard the defendants emphasize that Aydin was not only on shore, but also "off-duty." This argument ignores the defendants' "tipping system," an integral part of the carrier-passenger relationship that encouraged Aydin to socialize with and escort his assigned dinner passengers while off-duty in the ship's scheduled port-of-call. As discussed above, Doe was assigned to Aydin's dinner table each night, and was provided envelopes for tipping Aydin. Aydin's

job thus involved daily interaction with a particular set of passengers. Indeed, the defendants expressly permit socialization between crew members and passengers on shore at the Oasis. Aydin admits that his off-duty, on-shore interaction with his passengers enhances his tips. To some extent, defendants arguably have a pecuniary interest in off-duty crew members socializing with and escorting passengers in a port-of-call because it promotes the success of the defendants' tipping system as a way to pay Aydin for his services to the defendants.

It is further undisputed that on the very night in question Aydin, while on duty and serving in his role as a crew-member waiter, directed his dinner guest passengers to his favorite nightspot–the Oasis–within a short walking distance of the ship, and that Aydin was at the Oasis when Doe arrived. Although off-duty, Aydin admits escorting one of Doe's friends back to the ship before coming back to the Oasis and then escorting Doe ultimately back to the ship. While Aydin and Doe dispute whether he was taking her ostensibly to a bathroom first or to the park for sex, Aydin undisputedly had offered to help Doe in her distress. Aydin even referred to Doe as "his passenger," and there is ample evidence in the record that Doe allowed Aydin to escort her only because he was trusted as her waiter-crew member on the ship.

Accordingly, under all of the circumstances of this case, we cannot conclude

that the interaction between Aydin and Doe is outside the scope of the on-going carrier-passenger relationship or, as explained earlier, the scope of the on-going cruise.  Thus, when crew member Aydin sexually battered passenger Doe, the non-delegable duty owed by a common carrier to protect its passengers from crew member assaults during the cruise was breached.

### 6.  Florida Law

While we believe that Jopes and Tullis are the controlling precedent and that we need not reach Florida law, we recognize that the district court premised its pre-trial ruling partly on Florida law, which the defendants argue was erroneous.  The defendants further assert that Florida decisions contradict the Kermarec decision, and therefore the district court should not have relied on them.  The district court's order is actually unclear because it first seems to apply federal maritime law, but at the end appears to rely on Florida law for its strict liability ruling.

Nonetheless, to the extent the district court relied on Florida law, we find no reversible error as Florida law is entirely consistent with federal maritime law and imposes strict liability on a cruise line for crew member assaults on passengers.

For example, in Nadeau v. Costley, 634 So.2d 649 (Fla. Dist. Ct. App. 1994), the plaintiff passenger sued the crew member Costley and Carnival Cruise Lines, Inc., for damages from Costley's sexual assault of the plaintiff in her room.

In concluding that the passenger had a cause of action against the defendant cruise line in tort (strict vicarious liability) and in contract, the Florida appellate court explained that "Florida holds a common carrier responsible for the willful misconduct of its employees during the entire contractual period, notwithstanding the fact that the employee's actions fall outside the scope of employment." Id. at 652-53.

In reaching this conclusion, the Florida appellate court in Nadeau actually analyzed the relevant federal precedent, including the First Circuit's Muratore, the Ninth Circuit's Morton, and the Second Circuit's Rivers. The Florida appellate court determined that the same strict liability principle "has been recognized by federal courts applying admiralty law." Id. at 652 (citing Muratore and Morton). The Florida appellate court in Nadeau discussed Rivers and determined that the language in Rivers requiring negligence on the part of the carrier was "dicta" and was presented as part of a jury instruction that the Second Circuit believed was "actually favorable" to the defendant common carrier. Id. at 652 & 652 n.5.

In Nadeau, the Florida appellate court ultimately concluded that "[a]t best, admiralty courts are split on the question of whether independent negligence on the part of the shipowner is required to hold the owner liable for an intentional assault by a crew member." Id., at 652-53. Therefore, the Florida court in Nadeau

51

determined (1) that it was "free to apply Florida law in the absence of controlling maritime precedent," (2) that under Florida law the common carrier was strictly liable for the assault, and (3) that "applying Florida law to the instant facts would in no way alter the uniformity of admiralty decisions." Id.

Other Florida appellate decisions apply the same strict liability rule for employee assaults in common carrier-passenger cases. See, e.g., Pelot v. Atlantic Coast R. Co., 53 So. 937, 938 (Fla. 1910) (train case); Nazareth v. Herndon Ambulance Serv., Inc., 467 So. 2d 1076, 1078-79 (Fla. Dist. Ct. App. 1985) (ambulance common carrier case); Commodore Cruise Lines, Ltd. v. Kormendi, 344 So.2d 896 (Fla. Dist. Ct. App. 1977) (cruise line case).

Defendants argue that two Florida cases undermine Florida's strict liability rule, citing Rindfleisch v. Carnival Cruise Lines, Inc., 498 So. 2d 488 (Fla. Dist. Ct. App. 1986), and Riddle v. Aero Mayflower Transit Co., 73 So. 2d 71 (Fla. 1954). This argument is unavailing. In Rindfleisch, the parties agreed that federal maritime law controlled, and thus the Florida appellate court did not apply Florida law at all. Further, Rindfleisch was a slip-and-fall case, and the Florida appellate court correctly applied Kermarec's reasonable care standard. Rindfleisch, 498 So. 2d at 490-91. In addition, the Florida appellate court in Nadeau distinguished Rindfleisch and applied Florida law and a strict liability standard in a crew member

52

assault case.  Nadeau, 634 So. 2d at 651 n.3 & 652.  Thus, we conclude that Nadeau is more directly on point.

As to the second case, while Riddle did involve Florida law, it concerned "a common carrier in moving household goods," and the assault occurred in the plaintiff's home.  73 So. 2d at 71.  Accordingly, Rindfleisch and Riddle do not alter our conclusion (1) that Florida tort law imposes strict liability on cruise lines for crew member assaults on their passengers, (2) that as to this issue Florida law is consistent with federal maritime tort law, and (3) that to the extent the district court applied Florida law there is no reversible error in this case.

## D.  Sexual Assault Verdict

As stated above, the district court determined that the defendants were liable for Jane Doe's injuries if Aydin committed either a sexual assault or a sexual battery.  Also, as outlined above, the jury concluded that Aydin committed a sexual battery, but not a sexual assault, on Doe.

To the extent the defendants argue that there is some conflict between the jury's verdicts, we conclude that no conflict existed between a finding that, as instructed, Aydin committed a sexual battery, but not a sexual assault.

As described earlier, the district court instructed the jury that the defendants were strictly liable if Doe proved sexual battery as follows:

53

**Sexual Battery**

On Plaintiff's claim for sexual battery, Defendants . . . are strictly liable to Plaintiff for sexual battery if Plaintiff shows, by the greater weight of the evidence, the following:

That Baris Aydin, with his sexual organ, <u>penetrated or had union</u> with the vagina of Plaintiff; <u>and</u>

<u>That act was done without the consent of Plaintiff</u>.

(emphasis added). Therefore, to prove sexual battery, Doe had to prove only that Aydin had sexual intercourse with her (a fact that was not in dispute) and that she did not consent to the sexual intercourse; that is, if Doe did not consent to the sexual intercourse, Aydin was guilty of sexual battery. <u>See</u> Fla. Stat. ch. 794.011(1)(h) & (5).

In contrast, as to the sexual assault, the district court instructed the jury as follows:

**Sexual Assault**

On Plaintiff's claim for sexual assault, Defendants . . . are strictly liable for sexual assault if Plaintiff shows, by the greater weight of the evidence, either:

a) That Baris Aydin <u>intended to commit</u> a sexual battery on the person of Plaintiff; <u>and that the attempted act was done without the consent of Plaintiff</u>; or

b) That Baris Aydin intended to cause Plaintiff to fear an immediate sexual battery or rape; <u>and that the attempted act was done without the consent of Plaintiff</u>.

(emphasis added). Thus, as charged, a jury would have to conclude that Aydin: (1)

intended to commit a sexual battery and that the "attempted act" was done without Doe's consent; or (2) intended to cause Doe to fear an immediate sexual battery or rape and that the "attempted act" was done without Doe's consent. We readily conclude that the sexual battery and sexual assault charges, and the jury's verdict as to these charges, are in no way inconsistent.

First, a jury could reasonably have concluded that sexual assault charges were inapplicable because it was undisputed that Aydin had sexual intercourse with Doe, and, therefore, there was no "attempted act," only the completed act of sexual intercourse.[31] Furthermore, the jury could have viewed the "attempted act" language as necessarily related to the "intended acts" immediately preceding in the charge; that is, Aydin was not guilty of sexual assault because he did not attempt to: (1) commit a sexual battery (he in fact did commit a sexual battery); or (2) cause Doe to fear a sexual battery or rape.

Furthermore, the jury charges for sexual battery and sexual assault contain a simple, obvious difference, and, therefore, are not inconsistent. The sexual battery charge does not require that Aydin "intended" to engage in criminal conduct, whereas, the sexual assault charge requires that Aydin have the specific intent to

_____

[31]Aydin testified at some length about the sexual encounter. Specifically, he testified that, "I was still touching her body, vagina, and I went to kiss her again, we were still kissing, and then I put my penis into her vagina."

engage in criminal conduct.

The defendants seize on this last difference and argue that because sexual battery does not have, as an element, any specific intent to engage in criminal conduct it should not be considered an intentional tort. Therefore, according to the defendants' argument, strict liability is only for intentional torts and thus they should not be held strictly liable for Aydin's actions. The defendants' argument is flawed for several reasons.

First, the district court's sexual battery charge was consistent with Florida's criminal statute defining sexual battery and Florida Pattern Jury Instruction 11.4, in that it required a showing of only (1) sexual penetration and (2) a lack of consent.[32] Furthermore, under Florida law, sexual battery is a general intent crime and does not require that a defendant act with specific intent. See Coler v. State, 418 So.2d 238, 239 (Fla. 1982) ("State of mind is not a material fact in a sexual battery charge, nor is intent an issue."); Killian v. State, 730 So.2d 360, 362 (Fla. Dist. Ct. App. 1999); Jackson v. State, 640 So.2d 1173, 1174 (Fla. Dist. Ct. App. 1994); see also Askew v. State, 118 So.2d 219, 222 (Fla. 1960). Although the defendants correctly point out that specific intent is not required under sexual battery, the

_____

[32]Under Florida law, there are several types of sexual battery. For the purposes of this case we are concerned with sexual battery defined as the "oral, anal, or vaginal penetration by, or union with, the sexual organ of another. . . ." Fla. Stat. ch. 794.011(1)(h), and "without [Doe's] consent . . . ." Fla. Stat. ch. 794.011(5).

defendants incorrectly conclude that this means that sexual battery is not an intentional tort.

Florida law equates sexual battery with an intentional tort. See Doe v. Young, 656 So.2d 569, 570 (Fla. Dist. Ct. App. 1995) (describing plaintiffs' claims as "the intentional torts of battery and sexual battery"); see also Doe v. Evans, 814 So.2d 370, 380 (Fla. 2002) (J., Wells, dissenting) ("Importantly, there are no allegations that the alleged conduct resulted in any physical injury or that an intentional tort such as sexual battery occurred"); Scott v. Otis Elevator Co., 572 So.2d 902, 903 (Fla. 1990) ("This conclusion is supported by the definition of the intent necessary to establish an intentional tort. The intent with which tort liability is concerned is an intent to bring about a result which will invade the interests of another in a way that the law forbids.") (internal punctuation and citation omitted)). Furthermore, an intentional tort is "[a] tort committed by someone acting with general or specific intent [and] [e]xamples include battery, false imprisonment, and trespass to land." Black's Law Dictionary at 1527 (8th Ed. 1999).

Second, the defendant draws the wrong distinction. The distinction is not between those torts that have some overt requirement of specific intent and those torts that do not. Rather, the proper distinction is between intentional torts and those torts based on negligence. See City of Miami v. Sanders, 672 So.2d 46, 47

57

(Fla. Dist. Ct. App. 1996) ("An assault and battery is not negligence for such action is intentional, while negligence connotes an unintentional act.") (quotation marks omitted); Slawson v. Fast Food Enters., 671 So.2d 255, 258 (Fla. Dist. Ct. App. 1996) ("[T]he kind of harm sought to be avoided was an intentional assault, the oldest intentional tort."); see also St. John v. Coisman, 799 So.2d 1110, 1125 n.5 (Fla. Dist. Ct. App. 2001) (Sawaya, J., concurring in part, dissenting in part) ("Assault and battery are intentional torts as opposed to torts based on negligence."). For all the above reasons, it is clear that sexual battery is an intentional tort.

Finally, even assuming arguendo that sexual battery was not considered an intentional tort, the defendants' arguments still lack merit; that is, if a cruise ship can be held strictly liable for its crew members' intentional torts, a cruise ship can certainly be held strictly liable for other, lesser forms of crew member sexual assaults on passengers. We readily conclude that a sexual battery by a crew member is within that class of crew member assaults for which a ship, as a common carrier, is strictly liable to a passenger.[33]

---

[33]Defendants did not appeal the denial of their motion for remittitur, but do appeal the denial of their motion for new trial, which was premised on erroneous evidentiary rulings. On appeal, the defendants acknowledge that the district court denied their motion for new trial as moot but defendants request that, if we set aside the Rule 50(b) motion granted in their favor, we then decide whether the evidentiary rulings warrant a new trial. Thus, we will review for an abuse of discretion the district court's evidentiary rulings and denial of a motion for a new trial. Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1247-48 (11th Cir. 2001). The defendants

## VI. CONCLUSION

For the above reasons, we REVERSE the entry of judgment for the defendants because the district court lacked authority to enter judgment under Rule 50(b) on a new ground not raised by any party prior to submission of the case to the jury. We further reinstate and AFFIRM the jury's verdict for the plaintiff and REMAND the case to the district court to enter final judgment on the jury's verdict for the plaintiff and against the defendants.

---

argue that they are entitled to a new trial because the district court erred by (1) not permitting the defendants to "truthfully disclos[e] the judicial position, title and background" of the Bermudian magistrate who heard the criminal case in Bermuda and appeared as a defense witness at trial; (2) precluding defendants "from apprizing the jury of the outcome of the Bermuda court proceedings"; and (3) "allowing Doe to wear her military uniform during trial." After review, we conclude that the district court did not abuse its discretion in these rulings during trial, and defendants are not entitled to a new trial.

59